**SDC DEVELOPMENT CORPORATION,**
Plaintiff-Appellant,

v.

**F. David MATHEWS, Secretary of Health, Education and Welfare, et al., Defendants-Appellees.**

No. 75–3717.

United States Court of Appeals,
Ninth Circuit.

Sept. 29, 1976.

Rehearing and Rehearing En Banc
Denied Nov. 17, 1976.

J. D. Frascella (argued), Santa Monica, Cal., for plaintiff-appellant.

Michael Kimmel, Atty. (argued), of Civil Div., Appellate Sec., U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before TRASK, GOODWIN and KENNEDY, Circuit Judges.

ANTHONY M. KENNEDY, Circuit Judge:

In this case of first impression we consider whether a complete reference library of medical writings and publications, accumulated and stored in a computer data bank by an agency of the federal government, constitutes "agency records" for the purposes of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and must therefore be made available to the public for a nominal charge limited to the direct costs of search and duplication, *id.* § 552(a)(4)(A).

We hold that it does not and affirm the judgment of the district court.

In 1956 Congress established the National Library of Medicine "[i]n order to assist the advancement of medical and related sciences, and to aid the dissemination and exchange of scientific and other information important to the progress of medicine and to the public health . . . ." 42 U.S.C. § 275. The functions of the library are to acquire and preserve medical publications, index and catalogue the materials, make the indexes and catalogues available to the public, and provide such other research assistance as furthers the purposes of the statute. *Id.* § 276. The statute authorizes the Secretary of Health, Education and Welfare, with the advice and recommendation of the Board of Regents of the National Library of Medicine, to charge the public for using the services and materials. § 276(c)(2).

One of the services provided by the library pursuant to its statutory mandate is the Medical Literature Analysis and Retrieval System (MEDLARS), a computerized system for storing, indexing, and retrieving medical bibliographical data. The core of the system consists of the MEDLARS tapes, on which are stored citations and abstracts of two million articles from approximately 3000 medical and scientific journals published throughout the world. The National Library continually updates these tapes.

The MEDLARS system is used in various ways by the library. Some of the stored information is printed in various medical bibliographies, *e.g., Index Medicus,* which are distributed worldwide. Direct access to the MEDLARS data bank is available on a subscription basis through MEDLINE, the National Library's on-line terminal reference retrieval system.[1] A user desiring to acquire and copy the MEDLARS tapes may purchase the complete data bank through

---

1. Currently, approximately 350 institutions subscribe to the MEDLINE service. Subscribers are generally required to provide members of the public with access to MEDLINE at a set hourly rate. Any individual or organization may subscribe to MEDLINE, and the current hourly cost is $15 during peak hours and $8 at other times.

the National Technical Information Service;[2] the current charge for the tapes is $50,000.[3] The district court found that this charge was established in an attempt to recover some of the $10 million, which to date is the cost of preparing the MEDLARS data base.[4]

Appellant, SDC Development Corporation, neither subscribed to the MEDLINE system nor offered to purchase the MEDLARS tapes through the National Technical Information Service. It sought access to the tapes, rather, in a third and novel manner, which is the subject of this action. In a letter dated March 6, 1975, appellant requested that the library furnish, pursuant to the Freedom of Information Act, "a current and complete set of MEDLARS tapes, in the format in which they are currently stored in NLM's operational disc files." Appellant also requested "a complete copy of each and every updating tape as soon as each is prepared." It enclosed $500, an amount it estimated to be in excess of the cost of search and duplication of the first set of tapes.

The Freedom of Information officer of the Department of Health, Education and Welfare denied appellant's request for the MEDLARS tapes. An appeal to the Assistant Secretary for Health, Education and Welfare proved fruitless. Appellant filed suit in the district court, which entered summary judgment in favor of Government. This appeal followed.

Appellant's argument, both here and below, has the straight-forward appeal of a simple syllogism: The Freedom of Information Act requires reproduction, at nominal cost, of all agency records not falling within one of the listed exemptions. The MEDLARS tapes are agency records, not specifically exempted. Therefore, the MEDLARS tapes must be reproduced at nominal cost upon appellant's request. We cannot, however, accept appellant's minor premise and must therefore reject its conclusion.

The words "records" and "agency records" are key terms in the operation of the Freedom of Information Act, 5 U.S.C. §§ 552(a)(3), (a)(4)(A), but are not specifically defined by the statute. We note that to read these terms in the broad manner suggested by appellant would result in the obliteration of that portion of the National Library of Medicine Act, 42 U.S.C. § 276(c)(2), which gives the Secretary and the Board of Regents wide discretion in setting charges for use of library material. The Supreme Court, however, has held that the FOIA must be read in a manner consistent with previously existing statutes, insofar as such reading is compatible with the Act's purposes. *FAA Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975).[5] It is therefore necessary to examine the legislative purpose of the Act, as well as its structure, to determine whether the terms "records" or "agency records" can be defined in a manner that

---

**2.** The Technical Information Act, 15 U.S.C. §§ 1151–57 directs the Secretary of Commerce "to establish and maintain within the Department of Commerce a clearinghouse for the collection and dissemination of scientific, technical, and engineering information" and to make such available to industry, business, government, and the general public." *Id.* § 1152. The act specifies that "to the fullest extent feasible . . . each of the services and functions provided shall be self-sustaining or self-liquidating and that the general public shall not bear the cost of publications and other services which are for the special use and benefit of private groups and individuals." *Id.* at 1153.

**3.** The $50,000 fee, however, assures accuracy of information for only one year. Since the tapes are updated on a yearly basis, $50,000

must be paid each year to obtain a current set of tapes.

**4.** At oral argument counsel informed the court that no individual or institution had as yet paid the $50,000 for a set of tapes. However, the National Library has entered into profitable contractual agreements with universities and foreign governments whereby tapes are furnished in exchange for valuable assistance in the cataloguing, indexing, and abstracting of medical publications to update the data base.

**5.** The Court has stated even more recently that "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976).

will leave the operation of both statutes unimpaired.

The legislative history of the Freedom of Information Act [6] discloses deep congressional concern with the ability of the American people to obtain information about the internal workings of their government. Such information, Congress found, is vital in a democracy, for government by the people can be a reality only where the electorate can oversee the activities and decisions of public officials and agencies. The following excerpts from the Report of the Senate Committee on the Judiciary on S. 1160 underscore this purpose:

In introducing S. 1666, the predecessor of the present bill, Senator Long quoted the words of Madison, who was chairman of the committee which drafted the first amendment to the Constitution:

Knowledge will forever govern ignorance, and a people who mean to be their own governors, must arm themselves with the power knowledge gives. A popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy or perhaps both.

Today the very vastness of our Government and its myriad of agencies makes it difficult for the electorate to obtain that "popular information" of which Madison spoke. But it is only when one further considers the hundreds of departments, branches, and agencies which are not directly responsible to the people, that one begins to understand the great importance of having an information policy of full disclosure.

Although the theory of an informed electorate is vital to the proper operation of a democracy, there is nowhere in our present law a statute which affirmatively provides for that information.

S.Rep. No. 813, 89th Cong., 1st Sess. 2–3 (1965). In explaining the broad access provisions of the proposed legislation, the report elsewhere states quite simply: "[T]he public as a whole has a right to know what its Government is doing." *Id.* at 5. This sentiment was echoed in the House Report: "The right of the individual to be able to find out how his Government is operating can be just as important to him as his right to privacy and his right to confide in his Government." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 6 (1966), U.S.Code Cong. & Admin.News 1966, p. 2423. *See also id.* at 2–3, 12.

■ The legislative reports, as shown by the quoted excerpts, support the conclusion that the type of documents Congress was seeking to include in the public disclosure provision of the Freedom of Information Act were primarily those which dealt with the structure, operation, and decision-making procedure of the various governmental agencies.[7]

An examination of the other provisions contained in the Freedom of Information Act confirms this view. Rules of procedure and methods of organization of the various agencies, including amendments and repeals, must be published in the Federal Register. § 552(a)(1). Opinions (including concurrences and dissents), statements of policy and interpretations adopted by the agency, and administrative staff manuals which affect members of the public must be made available for copying. § 552(a)(2). Votes of each member of the agency in every agency proceeding must be recorded and made publicly available. § 552(a)(5). The foregoing are the types of information the public requires to keep track of govern-

6. The pertinent legislative history, of course, is that of the 1966 revision of section 3 of the Administrative Procedure Act. While the original section 3 contained a public disclosure provision, that provision was found to be totally inadequate and was frequently used as a means for withholding, rather than disclosing information. S.Rep. No. 813, 89th Cong., 1st Sess. 5 (1965). The 1966 amendment so completely overhauled section 3 of the APA that it bears little or no resemblance to its predecessor.

7. Particularly enlightening in this respect are the examples of abuses occurring under prior legislation enumerated in the House Report. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 5–6 (1966).

**1120**

mental activities. *See* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 6, 7–8 (1966).

Here the agency is not seeking to mask its processes or functions from public scrutiny. Indeed, its principal mission is the orderly dissemination of material it has collected. The agency is seeking to protect not its information, but rather its system for delivering that information. Congress specifically mandated the agency to prepare this system and hold it as its stock in trade for sale to the public. As such the system constitutes a highly valuable commodity. Requiring the agency to make its delivery system available to the appellants at nominal charge would not enhance the information gathering and dissemination function of the agency, but rather would hamper it substantially. Contractual relationships with various organizations, designed to increase the agency's ability to acquire and catalog medical information, would be destroyed if the tapes could be obtained essentially for free. *See* note 4 *supra.* It is also likely that the current charge system for MEDLINE, as well as various publications of the National Library, would be adversely affected.

There is, then, a qualitative difference between the types of records Congress sought to make available to the public by passing the Freedom of Information Act and the library reference system sought to be obtained here. The library material does not directly reflect the structure, operation, or decision-making functions of the agency, and where, as here, the materials are readily disseminated to the public by the agency, the danger of agency secrecy which Congress sought to alleviate is not a consideration.

▇▇▇ As already noted, moreover, the statutory mandate of the National Library may be substantially impaired if it is not permitted to charge for use of its retrieval system as expressly authorized by the Na-

tional Library of Medicine Act. The Supreme Court only recently reiterated that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 1994, 48 L.Ed.2d 540 (1976), *quoting Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). We conclude, therefore, that library reference materials for which charges are specifically authorized, such as the MEDLARS tapes sought in this case, are not "records" or "agency records" which must be made available at nominal charges pursuant to 5 U.S.C. §§ 552(a)(3) & (a)(4)(A).[8]

Appellant cites only one circuit court case in support of its interpretation of the term "records." *Soucie v. David*, 145 U.S.App. D.C. 144, 448 F.2d 1067 (1971). In that case plaintiffs had sought disclosure of the Garwin Report, prepared by the Office of Science and Technology, which evaluated the federal government's program for development of supersonic transport aircraft. One argument made against disclosure was that OST was not an agency, but merely part of the presidential staff, and hence the report could not be an agency record. In addressing that argument the circuit court focused primarily on the question whether OST was an agency for the purposes of the Freedom of Information Act, *id.* at 1072–1075, and concluded that it was. It then stated:

> Having concluded that the OST is an agency, we think it clear that the Garwin Report is a record of that agency for purposes of a suit under the Freedom of Information Act. The function of the OST is to evaluate federal scientific programs. Consequently, any report prepared by the agency or its consultants in fulfillment of that function must be regarded as a record of the agency.

*Id.* at 1075–76 (footnote omitted). Appellant would argue based on this passage that

**8.** We note that the term "records" is defined in 44 U.S.C. §§ 2901, 3301, specifically to exclude "[l]ibrary and museum material made or acquired and preserved solely for reference or exhibition purposes . . . ." While the definition is not expressly made applicable to the FOIA, we find it persuasive authority in support of the conclusion we reach today.

any time an agency prepares a document "in fulfillment of its function," that document becomes an agency record and falls within the ambit of the FOIA.

We do not read *Soucie* so broadly. The subject matter of the OST report was the deliberative product of the agency. The content of the report reflected not only the evaluative processes of the OST, but also novel facts about the operation of another governmental agency. To that extent the report is similar to the type of materials required disclosed by the FOIA, § 552(a)(2) (opinions, statements of policy, and interpretations of the agency). The *Soucie* court did not purport to address the situation where the material prepared by the agency was primarily of a reference nature, and its value lay not in the substance of its content, which after all is freely available in various publications throughout the world, but rather in the effort of accumulation, organization, and abstraction. In short, the *Soucie* court did not address the question of agency materials which are primarily of library reference nature, and our conclusion today is not inconsistent with that holding.

For the foregoing reasons, we conclude that the National Library of Medicine was not required to provide a copy of the MEDLARS tapes for the nominal cost of duplication, and that the district court properly granted appellee's motion for summary judgment.

AFFIRMED.