**Peter H. FORSHAM et al., Appellants,**

v.

**Joseph A. CALIFANO, Jr., Secretary of the Department of Health, Education and Welfare, et al.**

No. 76–1308.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1976.

Decided July 11, 1978.

As Amended July 19, 1978.

On Rehearing Oct. 17, 1978.

Harvey W. Freishtat, Boston, Mass., with whom Anthony J. Roccograndi, Chayet & Sonnenreich, Boston, Mass., was on the brief, for appellants.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for Federal appellees.

Mary Elizabeth Kurz, Asst. Atty. Gen. of the State of Md., Baltimore, Md., with whom David H. Feldman, Asst. Atty. Gen., of the State of Md., Baltimore, Md., was on the brief, for appellee, Klimt.

Before BAZELON, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

Concurring opinion filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge BAZELON.

LEVENTHAL, Circuit Judge:

In its broad aspect this appeal presents the question whether and under what conditions data compiled by a private group that is receiving money under a federal grant-in-aid program are or become "agency records" by virtue of the fact that the agency has funded the program and has the authority to demand those records.

An action was brought by specialists in the treatment of diabetes, as individuals and a committee,[1] to obtain raw research data of the University Group Diabetes Program (UGDP). The program is a privately conducted and federally funded long-term clinical study of the treatment of diabetes, that has reported certain harmful consequences attendant upon the long-term use of oral hypoglycemic agents. Plaintiffs question the validity of the study, and are concerned lest a useful therapeutic tool be unnecessarily removed from the market. They seek access to the raw data in order to implement their challenge to the study's validity.

The action was brought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. That Act is addressed to each "agency" of the Federal Government as defined.[2] Broadly speaking, and subject to

---

1. Three physicians sue in their own behalf, and in behalf of the Committee on the Care of the Diabetic, described in the complaint as an unincorporated association of 178 physicians involved in the daily treatment and management of diabetes.

2. 5 U.S.C. § 552(e):

    For purposes of this section, the term "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

exceptions, it directs each agency to make available to the public certain information, and also "agency records." It establishes the District Court's "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

## A. BACKGROUND

### 1. *The UGDP Study and the Sponsoring Institute*

The UGDP is a study funded by 13 federal grants administered by the National Institute of Arthritis, Metabolism and Digestive Diseases (hereafter sometimes Institute or NIAMDD). That institute is an "agency" under the Act, being part of the National Institutes of Health, which in turn is an organization within the Public Health Service, in the Department of Health, Education and Welfare. The grants were made under the statutory grant-in-aid authority of the Public Health Service Act, 42 U.S.C. § 241(c). The grants were made to each of 12 participating university medical centers on the basis of their applications, and a grant was made to the UGDP Coordinating Center at the University of Maryland.[3]

The pertinent background facts are presented in the affidavit of Dr. G. Donald Whedon, Director of NIAMDD:

4. The inspiration for the UGDP study came from private non-government physicians and scientists in mid-1959. Between 1959 and 1961, before the study actually began with the entry of the first patients, the design, methods, and objectives of the study were evaluated by per-

sons associated with the UGDP and representatives of NIAMDD. The Food and Drug Administration was not involved in the planning, inception, or design of the UGDP study. The study was funded by NIAMDD as part of its responsibility to support research in the field of diabetes and not with any specific regulatory objective in mind.

*   *   *   *   *   *

9. The UGDP raw data (e. g., patient charts and forms) are the property of the individual investigators and the Coordinating Center and are not owned by NIAMDD. Furthermore, it is not the normal practice of NIH or this Institute to require grantees to submit their raw data for review and, in fact, submission of raw data to the institute is extremely rare. Management of the day-to-day operations of grant-supported activities is the responsibility of the grantee. Supervision of the grantee's funded activities by this Institute is generally limited to review of periodic reports submitted by the grantee. (45 CFR §§ 74.80, 74.82). Due to the large number of research grants outstanding—currently approximately 1800—it would not be physically possible for the Institute to subject raw data, if submitted, to critical review, and to require submission of the raw data of the UGDP study would have been an extraordinary requirement. It is the practice to evaluate applications for renewal grants on the basis of progress reports and final reports submitted to NIH. This practice was followed with respect to the UGDP grants. No specific

---

**3.** The institutional grantees are:

| | |
|---|---|
| Case-Western Reserve University<br>Cincinnati, Ohio | University of Alabama<br>Birmingham, Alabama |
| Greater Baltimore Medical Center<br>Towson, Maryland | University of Cincinnati<br>Cincinnati, Ohio |
| Jewish Hospital and Medical Center of Brooklyn<br>Brooklyn, New York | University of Maryland<br>Baltimore, Maryland |
| Virginia Mason Research Center<br>Seattle, Washington | University of Minnesota<br>Minneapolis, Minnesota |
| Massachusetts General Hospital<br>Boston, Massachusetts | University of Puerto Rico<br>San Juan, Puerto Rico |
| Rush-Presbyterian-St. Luke's Medical Center<br>Chicago, Illinois | Washington University of St. Louis<br>St. Louis, Missouri |
| | West Virginia University<br>Morgantown, West Virginia |

provisions of the UGDP grants required submission of raw data to the Department of Health, Education and Welfare. Pursuant to 45 CFR § 74.23, officers or employees of the Department could obtain access to the raw data for purposes of audit inspection and copying if access is deemed pertinent to the grant. The raw data which are the subject of this case have never been seen by, or been in the possession of, any officer or employee of the National Institutes of Health. * *

The particular documents sought by the plaintiffs in this case are observations on over 1000 diabetic patients, who were monitored from 5 to 8 years. It is estimated that there are some 55 million such documents.

In June, 1970, the UGDP investigators made a presentation of the methods and initial results of their study at the annual meeting of the American Diabetes Association. The results indicated that the administration of tolbutamide (an oral hypoglycemic drug) to mild adult-onset diabetics led to a death rate from cardiovascular disease higher than that of groups treated with diet alone, with a fixed dosage of insulin, or with a variable dosage of insulin. The findings were published in the December 1970 Journal of the American Diabetes Association. During 1970 and 1971, over a dozen articles were published in medical journals concerning the study, some supportive and some critical.[4]

The NIAMDD contracted in 1972 with the Biometric Society, a private international professional society of biostatisticians,

for an in-depth assessment of the quality of the UGDP study. The Society made a report to the Institute in 1974 that apparently found some merit on both sides of the controversy. It concluded that while some of the criticisms of the UGDP study were valid most were unpersuasive, and the evidence of harmfulness adduced in the UGDP study was "moderately strong." This was made public in the American Medical Association Journal for February 1975.[5]

2.  *Food and Drug Administration*

The Food and Drug Administration of HEW, on being apprised of the UGDP results, issued in its October, 1970, Bulletin to the medical community a recommendation that tolbutamide should be used only in cases of adult-onset, stable diabetes that could not be controlled by diet and could not be treated with insulin. A June, 1971, FDA bulletin proposed changes in labeling of oral hypoglycemic drugs to warn of cardiovascular hazards. Plaintiff committee sued to enjoin the proposed labeling on ground of deficiencies in the UGDP study, and the First Circuit remanded to the FDA for exhaustion of administrative remedies.[6]

The FDA deferred further action on the labeling pending the review of the UGDP study by the Biometric Society. As already noted, the 1974 report of the Biometric Society was mixed, but overall found "moderately strong" evidence of harmfulness in the UGDP study. Its contract with NIAMDD did not require the Society to seek access to the UGDP raw data, but it apparently did examine some of the raw data.[7] The contract did not require the

---

**4.** For a listing see 40 Fed.Reg. at 28592.

**5.** 131 AMAJ 615.

**6.** *Bradley v. Weinberger*, 483 F.2d 410 (1st Cir. 1973). Plaintiffs contended *inter alia* that prior to regulatory action, the UGDP raw data should be made available to the scientific community. In reversing a preliminary injunction restraining the proposed relabeling, the First Circuit remanded to the FDA, ruling that the underlying questions required review on the full administrative record. Judge Coffin's opinion takes note (p. 414, fn. 4) of plaintiffs' contention that the record must include, *inter alia*,

the original patient records of the UGDP study, and continues: "While in light of our discussion we need not resolve the propriety of each of these requests, we reiterate what we recently said in an analogous situation: 'We think the law requires production of the entire administrative record . . . where the correctness of factual findings are [sic] involved . . . .'"

**7.** Plaintiffs say this access was impaired by Society-imposed limitations: to data for only one of the hypoglycemics studies, and only the period prior to October 1969.

Society to submit any raw data to the Institute, and none was submitted.

### 3. FOIA requests and District Court proceedings

Stressing that the raw data had been made available to the Biometric Society, plaintiffs' committee began a series of FOIA requests in 1974 and 1975 for access to the raw data and a copy of the draft report of the Biometric Society. Plaintiffs were given preliminary galley proofs of the report later published in the AMAJ. HEW notified plaintiffs on August 7, 1975, that the raw data were the property of those engaged in the UGDP study and had not been reviewed or even seen by either the UGDP sponsor (NIAMDD) or FDA.

This FOIA action was begun on September 30, 1975. The complaint sought the production of the raw data, defined as consisting of the forms transmitted to the Coordinating Center and the computer tapes and/or programs on the basis of which the data were analyzed. The complaint also sought a draft report of the Biometric Society.[8]

On Feb. 5, 1976, the district court granted the motion of the HEW officials to dismiss the complaint, on the ground that no official or employee of HEW is now or has ever been in possession of the raw data relating to UGDP, that these raw data are the property of the individual investigators and UGDP study coordinating center, and in the Center's possession, custody and control; that neither the investigators nor the Coordinating Center is an "agency" within 5 U.S.C. § 552, and that the raw data are not "agency records" subject to the disclosure provisions of FOIA.[9]

### 4. Developments pending appeal

On July 25, 1977, while the appeal to this court was pending, Secretary of HEW Cali-

fano issued an imminent hazard order suspending new drug applications for phenformin (another oral hypoglycemic drug), and there ensued administrative withdrawal hearings. This court requested supplemental memoranda of the parties on the question of whether data that would become available to plaintiffs as a result of these administrative proceedings would moot the present controversy. The federal appellees put it that there is neither certainty nor likelihood that plaintiffs will obtain access to all the data they seek as a result of the phenformin proceeding. They note, for one thing, that phenformin was only one of the oral hypoglycemic drugs subject to the warning of the UGDP study, the principal one being tolbutamide.

However, it appears that the FDA did examine certain of the underlying raw data (a small portion, quantitatively) in the course of a recent limited audit of the UGDP, and that this portion of the underlying information (except patient-identifying information) has been made available to plaintiff-appellants, and to other interested persons, participating in the phenformin proceeding. The federal appellees' memorandum states: "The FDA has no present intention of obtaining the remaining portions of the UGDP raw data through the auditing rights of the Secretary."

### B. ANALYSIS

We rule that the public at large does not have a right under the Freedom of Information Act to the underlying raw data in the hands of the investigators and university groups who conducted the UGDP study program of diabetes under grants from the federal government.

1. The plaintiffs are a respected group of medical specialists asserting that their access to the data would inure to the

---

8. It is not clear what draft report is intended, other than the galley proofs already supplied of the subsequently published in February, 1975, see fn. 5, above.

9. The district court dismissed as moot a motion by defendant Dr. Klimt, the director of the

UGDP Coordinating Center at the University of Maryland, to quash service of process. Dr. Klimt's directorship was based on his position as Director of Clinical Investigation in its School of Medicine. He was represented by the office at the Attorney General of Maryland.

public interest, by virtue of their concern that the use of drugs they deem valuable may be inhibited. We begin our analysis by observing that in this proceeding under the Freedom of Information Act, the court cannot give any weight to such a consideration.

■ The only claim ascertainable in this FOIA action is the right of any member of the public, motivated by whatever reasons. The Freedom of Information Act does not depend on a showing of need or interest by the particular applicant for the records. Any showing of need or interest is irrelevant.[10] Such considerations as need, interest, or public interest may bear on the agency's determination of the order of processing applications, but they have no bearing on the substantive right under FOIA to access to the document.[11]

2. To avoid any possible misunderstanding, we articulate that our ruling embodies no implication as to whether plaintiff physicians will have a right of access to the data underlying the UGDP study in connection with any existing or future actions of the Food and Drug Administration. That issue is distinctly different from what is before us now, and would have to be decided in the light of the record before the FDA.[12]

The FDA and NIAMDD are both in HEW, but that department is a conglomerate that embraces many and distinctly different activities. Insofar as it is engaged, through FDA, in a regulatory program, it may be subject to requirements of revelation that go beyond the FOIA's rules that govern all agencies. The FDA's regulatory actions are not before us in this FOIA lawsuit, which focuses on whether data become HEW records by virtue of study and granting activities (of NIAMDD).

10. *Sterling Drug, Inc. v. FTC,* 146 U.S.App.D.C. 237, 244, 450 F.2d 698, 705; *Robles v. EPA,* 484 F.2d 843, 847 (1973), repeating the quotation from K. Davis, Administrative Law, 1970 Supp. § 3A.22 (disclosure was never to "depend upon the interest or lack of interest of the party seeking disclosure").

See also K. Davis, *id.* at § 3A.29: "The Act never takes into account the need of the party seeking the disclosure; it never calls for balancing that need against the interest of a party adversely affected by disclosure. This policy choice reflects pressure from the press that 'the public as a whole has a right to know.'"

11. It is not relevant under FOIA that the published results of the UGDP were controversial; or that, as plaintiffs allege, the government relied on these results. If the Government examined "UGDP raw data at first hand" (dissent at 10), such data have become agency records and are subject to FOIA. If the Government has relied on results of a study based on data that it has not examined, a challenge that this was arbitrary—a matter we do not here decide—may proceed by well-established mechanisms independent of FOIA.

12. Plaintiffs' memorandum puts it that the First Circuit's opinion impliedly recognizes such a right. While a glimmer of sympathy for plaintiffs' position may be extracted from a reference in that opinion, tucked away in a discreet footnote, all that is said by the court is that the case in court must be determined on the basis of the entire administrative record. The issue here is whether the data in the hands of the researchers are part of the agency's records.

The issue of fairness to plaintiffs will require attentive consideration in the light of the administrative record. When issues of risk of harm are involved, an agency may use results of scientific researchers even without access to underlying data, as is evidenced by the frequent use of foreign studies, see e. g., *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 400, 541 F.2d 1, 28 (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). In the present case the government has undertaken some audit review of the raw data. Plaintiffs' memorandum argues that this audit was subject to limitations that undercut its utility, but obviously we cannot appraise that issue on the record before us at this time. A court reviewing the situation on the entire administrative record would also take into account the appraisal of the Biometric Society. We cannot on our record appraise its work and its significance, let alone either plaintiffs' aspersions on the way in which that Society's committee conducted itself or the government comment that its membership embraced a wide span of scientific opinion.

The Biometric Society set forth flaws in the work of the UGDP investigators, but when an investigation requires a protracted period flaws are not wholly unexpected, and their appearance may still leave the study with utility for appraisal of risk of harm to the public. *See Certified Color Manufacturers Assoc. v. Mathews,* 177 U.S.App.D.C. 137, 543 F.2d 284 (1976). The reviewing court would also consider the reasons, if any, given in any FDA proceeding involving oral hypoglycemic drugs for denying participants access to the raw data.

3. This action requires that the persons invoking the FOIA show that they seek "agency records." The NIAMDD is a government agency, of course. But the persons or institutions who receive study grants from that Institute, or indeed from any branch of the federal government, do not on that account become government agencies.

To some extent, our path is lighted by *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The case involved the Warren-Trumble council, a community action agency operating as a non-profit corporation under Ohio law, that was funded entirely by a federal agency, the Office of Economic Opportunity. Under the Economic Opportunity Act of 1964, the OEO furnished financial assistance to a community action agency, in turn defined as one designated by the state to plan and administer a community action program of "services and activities having a measurable and potentially major impact on causes of poverty in the community." The issue was whether or not one of the activities of the Ohio community action agency, the sponsoring of recreational outings for children, if conducted negligently, could give rise to an action under the Federal Tort Claims Act. The Supreme Court held that it could not, since the council was not a federal agency or instrumentality, and its employees not federal employees. The Court found that a critical element in distinguishing a federal "agency" from either a contractor with the federal government or a grantee of the federal government, was the federal government's "control [of] the detailed physical performance." [13]

Our decision today is congruent with our decision in *Washington Research Project v. HEW*, 164 U.S.App.D.C. 169, 504 F.2d 238 (1974), which reversed a district court order granting disclosure of certain reports made to the National Institute of Mental Health, a unit of the Public Health Service of HEW. The case involved reports made, on applications for research support, by peer review groups ("initial review groups" or IRG). The IRG peer review system was established by the government to assure competent evaluation of proposals through the use of "expertise of nongovernmental consultants functioning in panels organized around particular specialized disciplines within the broader field of biomedicine." [14]

The reports sought included a "site visit" to observe the pertinent experimental technique, and a "summary statement" of the observations and deliberations of the group, prepared by a NIMH staff member assigned to assist the group. The legal issue focused on whether the initial review group was itself a government "agency," in which case its own reports would be "final opinions" required to be disclosed under FOIA, and not intra-agency memoranda excluded under exemption 5. Acknowledging the "myriad organizational arrangements for getting the business of the government done," [15] the court concluded that "the IRG's are advisory committees, performing staff functions through the medium of outside consultancy, and are not agencies." [16] It observed, significantly, "Employing consultants to improve the quality of the work that is done cannot elevate the consultants to the status of the agency for which they work unless they become the functional

**13.** At fn. 5, 425 U.S. at 816, 96 S.Ct. at 1976, the Court put it that the issue was whether "there was day to day control of a program," it being irrelevant whether the program was funded by means of a contract or grant. The Court stressed (425 U.S. at 815, 96 S.Ct. at 1976): "Billions of dollars of federal money are spent each year on projects formed by people and institutions . . . responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its imple-

mentation." The Court found it irrelevant that the local council did not obtain funds from any other sources or conduct any programs without federal money (425 U.S. at 818, n. 7, 96 S.Ct. 1971).

**14.** 164 U.S.App.D.C. at 173, 504 F.2d at 242.

**15.** 164 U.S.App.D.C. at 177, 504 F.2d at 246.

**16.** 164 U.S.App.D.C. at 177, 504 F.2d at 246.

equivalent of the agency, making its decisions for it." [17]

4. Plaintiffs seek to avoid a head-on contention that federal grantees be assimilated as federal agencies. Instead they emphasize a congeries of considerations that they think cumulate to a right of public access to documents in the hands of the grantees.

In addition to the responsibility of plaintiffs and a claim of public interest in their access, which we have already shown to be irrelevant, plaintiffs stress the following; This was a multi-million dollar study, entirely funded by the federal government, of such a scale as to be non-replicable by private efforts and a unique public resource. By contract and regulation, the raw data underlying the study are available for government review, copying and storage. The government's exercise of its rights of audit demonstrates its "complete dominion and control" over the data through the audit process.

■■■ The Institute's grant documents establish its right of access to "any books, documents, papers, and records of the grantees" for certain purposes. To the extent that the language of the grant is material, it indicates that these are not agency records prior to the exercise of that right.

Plaintiffs' claim is in effect an assertion that the federal government should be required—formally or constructively—to exercise its contract-grant right of access in order to provide general public access. We cannot accept this proposition. The Freedom of Information Act only gives a right of access to agency records in existence. It does not confer a right to have the government generate agency records, either by creation, subpoena or contract demand. That conclusion is implicit in *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). The Court there granted the public a right to the production of the agency's appeal memorandum, pursuant to its understanding that the Act "represents a strong congressional aversion to 'secret [agency] law.'" (421 U.S. at 153, 95 S.Ct. at 1518). However the Court held that the public had no right to a judicial requirement that the agency produce or create explanatory material in the case of an appeals memorandum that referred only conclusorily to the "circumstances of the case." See 421 U.S. at 161, 95 S.Ct. at 1521:

> The Act does not compel agencies to write opinions in cases in which they would not otherwise be required to do so. It only requires disclosure of certain documents which the law requires the agency to prepare or which the agency has decided for its own reasons to create.

■■■ The governing principle is that only if a federal agency has created or obtained a record (or has a duty to obtain the record) [18] in the course of doing its work, is there an agency record that can be demanded under FOIA.[19]

---

**17.** 164 U.S.App.D.C. at 179, 504 F.2d at 248. Such consultants are employed and paid under the Public Health Service Act, 42 U.S.C. §§ 210, 217a. The court acknowledged that the consultant group's recommendations were undoubtedly "an often crucial element" in the approval process of the government, which was often typically a "perfunctory review." It regarded the degree of scrutiny as irrelevant to the court's consideration, stating that the fact that the government "may be greatly influenced by the IRG's expert view does not make the IRG an agency."

**18.** Judge MacKinnon's opinion leads me to acknowledge that this parenthetical reference is, strictly speaking, dictum. Yet in rejecting the claim that there is an FOIA entitlement because of the *power* of the agency to obtain a record, it seems material to observe that I see a

distinction where the agency has the *duty* to obtain the record. In that instance, I do not conceive that the official may lawfully resist the claim for the document on the ground that he has chosen to violate his official duty (to obtain it). In legal terms, the claim and lawsuit are in effect a joinder of two requests, and a joinder of an action in mandamus with one under the Freedom of Information Act.

**19.** We do not suggest that mere physical possession of records by a government agency is the sole criterion for determining whether they fall within the scope of FOIA. Obviously a government agency cannot circumvent FOIA by transferring physical possession of its records to a warehouse or like bailee.

Where records are created by a private entity, we believe the applicability of FOIA will

5. Overarching policy considerations are stressed by physician applicants. There is a plea for liberal reading of reform legislation. We agree that this reform legislation should not be niggardly construed in contravention of legislative objective. The "basic thrust" of the Act embraces "a general philosophy of full agency disclosure" subject to specific exemptions and the objective "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."[20]

However, the general policy of avoiding agency secrecy does not give a charter for extending the law beyond the domain of "agency" and "agency records" that is the keystone of the Act. To stretch for data in the possession of federal grantees, cannot be justified as within the fair contemplation of Congress either at the time the law was passed or amended, or even today under a doctrine of trying to reconstruct specific legislative intent in the light of the broad purposes disclosed by Congress.[21]

█ It is tautology to say that requiring disclosure of grantee records will promote the disclosure policies of FOIA. But disclosure is not required by the statute unless those records are agency records. Congress struck a balance in fashioning the FOIA, which precludes the boundless pursuit of one policy goal, even a dominant policy, to the exclusion of all countervailing considerations.

If the statute is to be given the kind of interpretation sought by plaintiff physi-

cians, the impact would be far-reaching. The number of documents in any one study would be stupendous—reaching millions in the single case before us. The number of federal grants and contracts is not a matter of record, but as was noted in *Orleans,* they account annually for disbursements in the billions. The awesome implications of plaintiffs' contention cannot be shrugged off because modern technology permits access to documents on tape through computer printouts, without need for physical production.

Scientists engaged in research on federal grants must accept the fact that any documents filed with the federal government, whether on the scientists' own initiative or an audit or other lawful demand, are subject to FOIA. Even in scientific terms, any such audit provides a surrogate for the kind of reliability usually accorded to scientific studies by replication of experiments when feasible. However, an undertaking to be audited by responsible personnel is not the same as an agreement to accept rummaging by the world at large.

The court will not trim FOIA by speculation as to adverse motivation or reaction of the scientists.[22] Similarly, the court cannot supply the extension of the reach of the Act sought by plaintiffs by building on a policy speculation that such an extension would not throttle scientific cooperation and research. This involves matters beyond our proper sphere of judicial notice.

turn on whether the government is involved in the core planning or execution of the program, or whether, by contrast, the entity retains its private character in bona fide fashion during the course of the endeavor that results in the records. Even in the latter situation, however, records that are examined by the government through audit rights may become agency records under FOIA—if, for example, the records are copied by the agency or come into its possession.

20. *Department of Air Force v. Rose,* 425 U.S. 352, 360, 95 S.Ct. 1115, 43 L.Ed.2d 392 (1976). Opinions of this court to the same effect include *Bristol Myers Co. v. FTC,* 138 U.S.App. D.C. 22, 25, 424 F.2d 935, 938 (1970); *Getman v. NLRB,* 146 U.S.App.D.C. 209, 211, 450 F.2d 670, 672 (1971).

21. *Montana Power Co. v. FPC,* 144 U.S.App. D.C. 263, 445 F.2d 739 (1970), *cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971).

22. In considering Exemption 4 for trade secrets or commercial information, the court found it irrelevant to inquire whether non-commercial scientists are either "a mean-spirited lot who pursue self-interest as ruthlessly as the Barbary pirates did in their own chosen field," or are governed by the loftier consideration that "secrecy is antithetical to the philosophical values of science." *Washington Research Proj., Inc. v. HEW,* 164 U.S.App.D.C. 169, 175, 504 F.2d 238, 244 (1974).

What is requested in this action, in our view, is an extension of the statute on claim of public interest that must be appraised by the legislature which can give the subject extended study, elicit opinions from all interested sources, and consider the pro's and con's.

6. It is fitting to close by referring to the need, in any pondering of such extension of the FOIA, for considering the impact on the philosophy and purpose of Federal grant programs.

Grant programs represent a means for the governance of our society which is rooted in a pluralistic conception of the value of drawing on both private and governmental sources. A leading student of Federal grant law puts it [23]

> The grant is assistance to an autonomous grantee. The grantee is not an arm, agent or instrumentality of the grantor. The employees of the grantee are not federal employees. The torts of the grantee are not federal torts. The property of the grantee is not federal property.

The reference to "an *autonomous* grantee" is a core concept, not an incidental observation. In a grant program the federal government gets the advantage of services rendered by someone who is doing his own thing, his own autonomous thing. It is not the same as a government operation in disguise.

Through its grants to university groups, the government obtains the efforts of creative persons who flourish in an academic atmosphere. Such arrangements provide a measure of detachment and independence from the mission of the government agency. The researchers may feel the tug of government purse strings, but they also feel answerable to the standards of their academic colleagues.

Plaintiffs cite the multi-million dollar nature of the study as a reason for access. There is at least a question whether the federal government could have conducted directly, through its own employees and resources, a study program so long in time, so broad in space, and covering so many patients and controls. Even in a case where the grant is to conduct a study that might conceivably be conducted by federal employees, there is an advantage in terms of effective government and advancement of the public interest if the study is done by various institutions. The government goes beyond the capabilities of its own employees, adding the spirit and insights of the scientists and students who have selected a different life style, at a center of learning.

As earlier noted, we are not concerned here with the kind of case where the federal government exercises detailed control over operations. Such a condition presents different considerations, as noted in *Orleans*. Nor do we have a suggestion of subterfuge, with a federal agency seeking to conduct research outside the scrutiny of government laws, by using facilities that are independent only nominally. The case before us concerns a UGDP study conceived in 1959 by private, non-government physicians and scientists. They developed their own methodology; it was not dictated by the federal government.

Of course, in any program funded by the federal government there is an opportunity for the government to assess the results of the performance and of any studies. There may also be directions by the federal government in certain matters of public policy that are essentially peripheral to the core of the work done. There may, for example, be a requirement of avoidance of discrimination on grounds of race, religion, creed or sex. There may be achievement of other government objectives which apply across the board to all activities financed by the federal government.

The central question is whether the government is really involved in the core of the program. At least in a case such as the one before us, where there was no claim of

---

**23.** M. S. Mason, *Current Trends in Federal Grant Law-Fiscal Year 1976,* 35 Fed.Bar. 163, 167–68 (1976).

significant government control of day-by-day operation, or detailed involvement in the planning or execution of the program, the overall concept of autonomy of grantees persists, even though there are federal objectives, right of federal audit and perhaps some overarching federal requirements.

At least a fleeting reference should be made to acknowledge that some of the federal grantees are institutions of the state governments.[24] There are thus considerations of federalism involved. These are not necessarily of constitutional dimension. However, they are not without relevance in appraising the extent to which such grantees are automatically governed by rules provided by Congress for the federal agencies, such as govern access to records and meetings, or personnel management,[25] or any other rules.

The foregoing matters indicate that a balance must be struck, one that considers the advantages of grantees that are autonomous and have value because they are not governmental, and the possibly conflicting policy that cherishes full and free public access to government agencies and shuns secrecy as invidious. Such a balancing is a task for the legislature. The extension of access sought by plaintiffs on the ground of public interest is not properly addressed to the courts.

*Affirmed.*

MacKINNON, Circuit Judge, concurring:

I join generally in Judge Leventhal's opinion but wish to add the following observations.

5 U.S.C. § 552(a)(3) provides: "[E]ach agency, upon any request for *records* . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(4)(B) also refers to the location of *"agency records"* as constituting one basis for conferring on the district court for that district "jurisdiction to enjoin the agency from withholding *agency records* and to order the production of any *agency records* improperly withheld

from the complaint. In such a case the court . . . may examine the contents of such *agency records* in camera . . ." (Emphasis added.) A fair conclusion from the foregoing indicates that it is not just "records" but *"agency* records" that the statute is addressing.

The court's opinion at page —— of 190 U.S.App.D.C., at page 1136 of 587 F.2d states:

The governing principle is that only if a federal agency has obtained a record (*or has a duty to obtain the record*) in the course of doing its work, is there an agency record that can be demanded under FOIA. [Emphasis added.]

The italicized statement is not necessary to our decision and I do not join in it. Each particular case involving a request for records not in the possession of an agency but for which, it is alleged, there is some duty to obtain the records must be decided on its particular circumstances. I would leave to a future opinion any declaration as to the extent to which the FOIA should be interpreted to cover records not created by, obtained by, or otherwise in the possession of an agency. The plain implication derived from the language of the statute is that it does apply to records which belong to the agency or are in its possession—that is, records which the agency has created or obtained. That is all that is needed to decide this case. I would not refer to records about which it might be said that an agency might have some duty to obtain until such time as we are presented with a case that raises the question directly and presents to us all the relevant facts necessary to decide the applicability of the FOIA to that situation.

The dissent would go even further and substitute for the normal interpretation of the language of the statute a meaning to be derived from an extraneous examination of *"all* the relevant circumstances surrounding the creation, preservation, and use of [the] particular records" (Dissent at —— of 190 U.S.App.D.C., at 1142 of 587 F.2d, emphasis original). Then, "[i]f this analysis re-

---

24. See note 9, *supra,* as to University of Maryland.

25. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

veals a significant degree of federal involvement with the records, then they should be considered agency 'records' subject to FOIA" (*Id.*, footnote omitted). The *catch* is allowing the interpretation of the statute to turn upon what a judge might consider a *"significant* degree of federal involvement." The attempt is to impose a "chancellor's foot" standard which varies with each judge. The statute, however, is not susceptible of such construction, and happily so, for those whose foot gives them a short standard would find records to be *"agency* records" wherever there was any federal funding or access to the records. That standard, as applied by some courts, would extend the FOIA to practically unlimited lengths in those universities and industries which engage in private research. If Congress desires the Act to be so extended, it can do so by enacting appropriate legislation; but my view coincides with that expressed in Judge Leventhal's opinion, that such an extreme extension of the Act should not be created by judicial fiat.

In reaching this conclusion, I see no harm to the public. Where particular records are the subject of legitimate inquiry, as in the two cases referred to in the dissent, they may be subpoenaed by interested parties.

BAZELON, Circuit Judge, dissenting:

Plaintiffs seek disclosure of the raw data of a federally-sponsored research project,

the University Group Diabetes Program (UGDP). The UGDP data are locked in a bank vault in Maryland in the custody of the UGDP program coordinator. For the majority, this means they are not agency "records" subject to disclosure under the Freedom of Information Act (FOIA). With all due respect, I cannot agree.

In my view, factors other than possession are relevant in determining whether the UGDP data are agency "records." The Federal Government has provided all of the funding for the UGDP; the Government has an unrestricted right of access to the data; and importantly, the Government has extensively relied on the UGDP study and data in regulatory action affecting the treatment of diabetes. I think these factors cumulatively establish a significant degree of federal involvement with the UGDP raw data. Accordingly, I would hold that they are agency "records."

I.

The Freedom of Information Act requires federal agencies to disclose all "records," 5 U.S.C. § 552(a)(3),[1] that do not fall within one of nine exemptions. *Id.* § 552(b)(1)–(9). No definition of the term "records" is found in either the Act or the legislative history.[2] The case law, focusing almost exclusively on the exemptions, sheds little light on this

---

[1] [E]ach agency, upon request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person. 5 U.S.C. § 552(a)(3) (1974). As originally enacted, this section provided:

[E]ach agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person.

The section was amended in 1974 to make clear that "[a] 'description' of a requested document would be sufficient if it enabled a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." H.R.Rep.No.876, 93d Cong., 2d Sess. 5–6

(1974), U.S.Code Cong. & Admin.News 1974, pp. 6267, 6271.

[2] The 1967 Attorney General's Memorandum does contain one sentence relevant to the definition of agency records. It says: "Subsection (c) [552(a)(3)] refers, of course, only to records in being and in the possession *or control* of an agency." R. Clark, Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967) *reprinted in* Freedom of Information Act Source Book, S.Rep.No.82, 93d Cong., 2d Sess. 222 (1974) (emphasis added). Although the Attorney General's Memorandum is a doubtful guide to congressional intent, see K. Davis, Administrative Law Treatise 117 (1970 Supp.), the fact that it refers to two criteria for defining agency "records"—possession or control—suggests a more inclusive approach than that adopted by the majority. I would also argue that the Attorney General's Memorandum is consistent

term.[3] We are thus left with little direct guidance in attempting to elucidate a key provision of the Act.

The majority does not discuss the difficulties involved in defining agency "records." It simply asserts, with little supporting rationale, that the crucial question is whether the documents have been "created" or "obtained" by a federal agency.[4] In adopting this approach, the majority joins with the federal defendants and the district court in looking to such factors as property rights and possession in defining agency "records."[5] I have no objection to title or custody as relevant criteria. I do object, however, to a test based on only some of many possibly relevant factors, with little justification offered for the primacy of these factors. The place to start in determining the scope of agency "records" is not with assertion, but with an examination of the policies of the FOIA.

There can be no doubt about the basic goals of the Freedom of Information Act.

As the Senate Report put it, the fundamental premise of the Act is that "the public as a whole has a right to know what its Government is doing." S.Rep.No.813, 89th Cong., 1st Sess. 5 (1965). FOIA was designed, in the words of the Report, "to establish a general policy of full agency disclosure unless information is exempted under clearly delineated statutory language. . . ." Id. at 3. In the House, Congressman after Congressman rose to speak in support of the policy underlying the bill. This was, as they variously put it, the right to the public "to information relating to the actions and policies of Federal agencies," 112 Cong.Rec. 13655 (1966) (remarks of Rep. Hall); "to know the facts about the operation of their government," id. at 13657 (remarks of Rep. Reid); "to be fully informed about the policies and activities of the Federal Government," id. at 13648 (remarks of Rep. Faschell). These statements suggest the need for a broad definition of agency "records": broad

with the result I would reach here, since in my view the Government involvement with the UGDP data amounts to "control."

**3.** *But see Goland & Skidmore v. CIA,* No. 76–1800 (D.C.Cir., May 23, 1978) (congressional hearing transcript in possession of agency not an agency record); *SDC Development Corp. v. Mathews,* 542 F.2d 1116 (9th Cir. 1976) (materials in medical reference library not agency records); *Cook v. Willingham,* 400 F.2d 885 (10th Cir. 1968) (per curiam) (presentence report in the hands of prison authority not an agency record); *Ciba-Geigy Corp. v. Mathews,* 428 F.Supp. 523 (S.D.N.Y.1977) (UGDP raw data not agency records); *Nichols v. United States,* 325 F.Supp. 130 (D.Kan.1971), *aff'd,* 460 F.2d 671 (10th Cir.), *cert. denied,* 409 U.S. 966, 93 S.Ct. 268, 34 L.Ed.2d 232 (1972) (physical evidence relating to assassination of President Kennedy not "records"). I exclude cases that turn on the definition of a federal "agency." *E. g., Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971).

**4.** Maj. op. at —— of 190 U.S.App.D.C., at 1136 of 587 F.2d. Apparently, the majority would also recognize agency "records" where the Government is involved in the "core planning or execution" of a program, maj. op. at —— n. 19, ——-—— of 190 U.S.App.D.C., at 1136 n.19, 1138–1139 of 587 F.2d; and where a federal agency has a duty to obtain records. Maj. op. at —— of 190 U.S.App.D.C., at 1136

of 587 F.2d. *But see* concurring op. at —— of 190 U.S.App.D.C., at 1139 of 587 F.2d.

**5.** The district court found that

(1) no official or employee of the Department of Health, Education and Welfare (HEW), the National Institute of Health (NIH), the Food and Drug Administration (FDA), or the National Institute of Arthritis, Metabolism and Digestive Diseases (NIAMDD) is now or has ever been in possession of raw data in issue relating to the University Group Diabetes Program (UGDP) . . .; (2) the raw data in question is [sic] the property of the individual investigators and UGDP coordinating center and remains in the possession, custody and control of the UGDP study coordinating center . . .; (3) neither the individual investigators nor the UGDP study coordinator is an 'agency' within the purview of the Freedom of Information Act, 5 U.S.C. § 552; and (4) consequently, the raw data in issue are not 'agency records' subject to the disclosure provisions of the Freedom of Information Act, 5 U.S.C. § 552(B) [552(a)(4)(B)]. Joint Appendix (J.A.) at 146–47 (footnote omitted).

The federal defendants' position is that "the term 'agency records' in the Freedom of Information Act applies to 'records' in the possession of a federal agency or owned by an agency, or produced under the day-to-day supervision of an agency." Gov. Br. at 17.

enough to let the public know everything "its Government is doing;" to illuminate all "policies and activities of the Federal Government."

The principle that "the disclosure requirement be construed broadly . . .," *Soucie v. David*, 448 F.2d 1067, 1080 (D.C.Cir. 1971), is also rooted in the structure of FOIA. Before FOIA was enacted, the public information section of the Administrative Procedure Act allowed agencies to withhold information "in the public interest," or "for good cause shown," or if the person seeking the information was not "properly and directly concerned." 5 U.S.C. § 1002 (1964). These broad exemptions created what was in effect a "withholding statute," not a "disclosure statute." [6] To remedy this situation, Congress enacted a statute containing a general disclosure section and nine narrowly drawn exemptions. The disclosure section provided that "any person" could have access to any agency "record," without having to state a reason for wanting the information. And the exemptions were drafted to provide "definitive guidelines" [7] as to what information could be withheld. To avoid new loopholes, Congress expressly limited the grounds for nondisclosure to those specified in the exemptions.[8] The objective was to "make it clear beyond doubt that all *materials of the Government* are to be made available to the public by publication or otherwise unless explicitly allowed to be kept secret by one

of the exemptions in [§ 552(b)]." S.Rep.No. 813, *supra* at 10 (emphasis added in part).

Both the purpose and the structure of FOIA point to a broadly inclusive definition of agency "records"—a definition encompassing "all materials of the Government." I seriously doubt that common law notions of property or custody can define the totality of such records. In my view, the appropriate approach under the statute is to examine *all* the relevant circumstances surrounding the creation, preservation, and use of particular records. If this analysis reveals a significant degree of federal involvement with the records,[9] then they should be considered agency "records" subject to FOIA.

## II.

Plaintiffs emphasize three forms of federal involvement with the UGDP research data: federal funding of the data, federal access to the data, and federal reliance on the data in administrative decisionmaking. We need not decide whether one of these factors, or even two of these factors in combination, would be sufficient to make the UGDP data agency "records." Where all three factors are present, however, I think these materials are clearly agency "records."

### A.  *Government Funding*

One hundred percent of the UGDP funding was provided by the National Institute

---

6. S.Rep.No.813, *supra* at 5.

7. *Id.* at 3.

8. This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section.

5 U.S.C. § 552(c) (1970).

I agree that in enacting FOIA Congress struck a deliberate balance between a policy of full disclosure and various countervailing policies. Maj. op. at —— of 190 U.S.App.D.C., at 1137 of 587 F.2d. But the legislative history makes it abundantly clear that all of the competing policies *Congress* saw fit to recognize were to be accommodated through nine specific exemptions. It comes as a surprise, therefore, to learn that a policy not mentioned by Congress—that of preserving grantee "autonomy," maj. op. at —— of 190 U.S.App.D.C., at

1138 of 587 F.2d is to be realized through a restrictive definition of agency "records."

9. Another court that has grappled with whether the UGDP raw data are agency "records" concluded "that the goals and purposes of the Act would be served best by imposing a standard which calls for proof that the records were either Government-owned or subject to substantial Government control or use. In other words, it must appear that there was significant Government involvement with the records themselves in order to deem them agency records." *Ciba-Geigy Corp. v. Mathews*, 428 F.Supp. 523, 529 (S.D.N.Y.1977). Although I disagree with Judge Tenney's application of this standard, particularly his conclusion that the Government has not directly relied on the UGDP raw data, *id.* at 531, I have no quarrel with his statement of the standard itself.

of Arthritis, Metabolism, and Digestive Diseases (NIAMDD), one of the institutes of the National Institutes of Health. Federal funding is significant for FOIA purposes for two reasons. First, funding of scientific research is a federal activity, and FOIA was enacted to allow the public to obtain information about all federal activities—including the expenditure of money. As one Congressman put it, FOIA was intended in part to enhance the rights and responsibilities of the voting public by making it possible for them to know "what their Government is doing with their money." 112 Cong.Rec. 13659 (1966) (remarks of Rep. Gurney); *accord* 110 Cong.Rec. 17088 (1964) (remarks of Sen. Dirksen).

Federal funding of the UGDP is also important because funding brings with it significant Government control over the use, maintenance, and disposition of the UGDP raw data. This can be seen by examining HEW regulations governing the relationship between the Government and the grant recipient. Under these regulations, the grantee is obliged to retain "financial records, supporting documents, statistical records, and all other records pertinent to an HEW grant" for a period of three years after receiving the grant. 42 C.F.R. § 74.20. If the granting agency determines that any of the records generated by the grantee have "long term retention value," the agency may order the records transferred to the Government for permanent custody. *Id.* § 74.20(b). At all times, the Government has the right of access to "any books, documents, papers, and records of the grantee" for the purpose of making "audit, examination, excerpts and transcripts." *Id.* § 74.23(a). The regulations further require that the grantee retain all "[l]aboratory notes, related technical data and information" that pertain to a patentable invention, and make them avail-

able to HEW upon request. *Id.* § 52.22. And if the grantee copyrights a publication resulting from the grant, the regulations give the Government a royalty free, nonexclusive license "to reproduce, translate, publish, use, disseminate, and dispose of such materials and to authorize others to do so." *Id.* § 52.23. While these provisions probably fall short of establishing full federal ownership of the UGDP data, *see* Gov. Br. at 26–31, they do establish, I think, that the Government has a substantial degree of control over the use and disposition of the UGDP records.

### B. *Government Access*

Under the HEW grant regulations, the Government has an apparently unlimited right of access to the UGDP raw data. 45 C.F.R. § 74.23(a) provides:

> HEW and the Comptroller General of the United States, or any of their duly authorized representatives, shall have access to any books, documents, papers, and records of the grantee which any of them determine are pertinent to a specific HEW grant, for the purpose of making audit, examination, excerpts and transcripts.[10]

HEW is permitted to "examine" and "excerpt" not only the financial records of the UGDP, but also raw research records. This is demonstrated by the fact that when the FDA conducted a scientific audit of the UGDP, portions of the raw data were examined by government investigators, copied, and then retained by the agency. Gov. Supp. Memo. of Dec. 5, 1977.

The Government's right of access to the UGDP raw data is important for FOIA purposes since it establishes the basis for Government compliance with FOIA requests. Obviously, the Government must be able to obtain copies of requested agency "records" quickly and without legal impedi-

---

10. The Government may have access to the UGDP raw data under FDA regulations as well. 21 C.F.R. § 312.1(a)(12)(6)(e) gives the FDA the right of access to investigator's records relating to investigational new drugs (INDs). The UGDP holds two INDs from the FDA. J.A. at 92. The federal defendants note that the regulation requires investigators to *retain* such rec-

ords for only two years after administration of an IND has been discontinued, and assert that the UGDP discontinued use of its INDs more than two years ago. Gov. Br. at 34–35. However, there is no indication that the UGDP has in fact discarded the records, or that the FDA *right of access* is extinguished two years after administration of an IND stops.

ment.[11] For example, if the Government had to purchase certain data, or subpoena certain records to comply with a FOIA request, these materials might not be considered agency "records." We need not decide this question, for no such barrier is involved here. The Government can exercise its right of access to the UGDP data at any time and for any reason. To be sure, greater inconvenience may be involved in obtaining copies of documents not in the immediate custody of the agency. But, as the Government concedes, agency "records" need not be located within the physical confines of the agency. Gov. Br. at 20 n. 32. Records may be bailed to a privately-owned warehouse, loaned to a private entity, or may have been sold or donated to the Government but not delivered. In terms of ease of compliance with FOIA, these types of situations are indistinguishable from the present case.[12]

### C.  Government Reliance

Probably the strongest link between the UGDP data and the Federal Government is found in the extensive history of federal reliance on the UGDP study and data in regulatory action dealing with the treatment of diabetes. This reliance must be viewed against the background of intense controversy surrounding the UGDP ever since the study's first conclusions were published in 1970.[13]

Release of the UGDP's initial findings, suggesting a possible correlation between oral hypoglycemic drugs and cardiovascular mortality, had a profound impact.[14] Professional conferences were convened, articles were published, and scientific studies were undertaken with the hope of evaluating the UGDP conclusions and determining their validity. The medical and scientific communities eventually divided along pro- and anti-UGDP lines. Supporters of the UGDP cited the study's cost, duration, broad patient base, and sophisticated design as confirming the validity of the findings.[15] Critics of the UGDP, on the other hand, pointed to alleged inadequacies in study design,

---

**11.** The Act requires agencies to determine whether to comply with a FOIA request "within ten days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request  . . ."  5  U.S.C. § 552(a)(6)(A) (1974). An additional 10 days is permitted in "unusual circumstances," including "(i) the need to search for and collect the requested records from field facilities or *other establishments* that are separate from the office processing the request;  . . ."  *Id.* § 552(a)(6)(B)(i) (emphasis added). The last provision appears to specifically contemplate that agency "records" can be found outside the custody of the agency.

**12.** The majority's assertion that *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161–62, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) and *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 192, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975) require more than a mere right of access to documents is without foundation. These cases stand only for the proposition that FOIA does not oblige an agency to *write* opinions. They say nothing about the duty to retrieve records that are reasonably described, admittedly exist, and are within an agency's power to obtain.

**13.** Klimt, Knatterud, Meinert & Prout, *The University Group Diabetes Program: A Study of the Effects of Hypoglycemic Agents on Vascu-*

*lar Complications in Patients with Adult-Onset Diabetes*, 19 Diabetes (Supp. 2) 747 (1970). Subsequent reports were published in Knatterud, Meinert, Klimt, Osborne & Martin, *Effects of Hypoglycemic Agents on Vascular Complications in Patients with Adult-Onset Diabetes; IV. A Preliminary Report on Phenformin Results*, 217 JAMA 777 (1971); Goldner, Knatterud & Prout, *Effects of Hypoglycemic Agents on Vascular Complications in Patients with Adult-Onset Diabetes: III. Clinical Implications of UGDP Results*, 218 JAMA 1400 (1971); Knatterud, Klimt, Osborne, Meinert, Martin & Hawkins, *A Study of the Effects of Hypoglycemic Agents on Vascular Complications in Patients with Adult-Onset Diabetes: V. Evaluation of Phenformin Therapy*, 24 Diabetes (Supp. 1) 65 (1975).

**14.** Some of the controversy surrounding the UGDP study is reviewed in the majority opinion at —— – —— of 190 U.S.App.D.C., at 1131–1132 of 587 F.2d.

**15.** *See, e. g.*, Cornfield, *The University Group Diabetes Program: A Further Statistical Analysis of the Mortality Findings*, 217 JAMA 1676 (1971); Prout, Knatterud, Meinert & Klimt, *The UGDP Controversy: Clinical Trials Versus Clinical Impressions*, 21 Diabetes 1035 (1972).

methodology, and execution.[16] The controversy was compounded when a UGDP investigator, Dr. Angela Bowen, resigned from the study, challenging the integrity of the program director and suggesting a possible manipulation of the data base to reach results unfavorable to one of the drugs under study.[17]

Despite all the uncertainty about the validity of the UGDP study, and the inability of skeptical scientists and physicians to examine the raw data, the Federal Government has twice relied on the UGDP findings in regulatory action affecting a large segment of the public. In 1975, the Commissioner of the Food and Drug Administration (FDA) proposed new labeling requirements for oral hypoglycemic drugs used in the treatment of diabetes. 40 Fed. Reg. 28587 (1975). The *Federal Register* notice of the proposed warning stated in part:

> The judgment of the Commissioner that changes must be made in the labeling of

16. *See, e. g.*, Feinstein, *Clinical Biostatistics: An Analytical Appraisal of the University Group Diabetes Program (UGDP) Study*, 12 Clin. Pharmacology, Therapeutics 167 (1971). Schor, *The University Group Diabetes Program: A Statistician Looks at the Mortality Results*, 217 JAMA 1671 (1971).

17. Dr. Bowen testified as follows before FDA at the public hearings on the proposed labeling change for oral hypoglycemic drugs:

> An even more troublesome aspect has not been as well explored. This involves the matter of personal integrity and scientific honesty of one key member of the group. This question was actively considered both privately and openly among the investigators as early as 1968. It has also been asked publicly since that time. The question that the FDA must now ask and hopefully answer is "were the data that were gathered in the field accurately and honestly recorded and reported from the coordinating center in Baltimore?" I fully recognize that this is a serious allegation but there is basis for reasonable doubt. You will recall that this was a double blind study. Investigators did not know what medication a patient was taking. Data were simply recorded and sent along to the biostatistician at the coordinating center. We then received a printout of the cumulative results. Therefore if one was told that a given death or other side effect occurred in a tolbutamide patient it was taken on faith because the investigator never knew for sure.

the oral hypoglycemic drugs to reflect the findings of the UGDP study is well known. . . .

> The warning proposed in this labeling is based primarily on a thorough review and evaluation of the UGDP study. . .

> The Commissioner reaffirms his view that the UGDP study is an adequate and well-controlled clinical trial, which is the most extensive and detailed examination of the long-term administration of hypoglycemic agents yet undertaken.

> . . . The Commissioner believes that the UGDP study is a validly conducted trial and accepts the opinion of the Biometric Society committee and other experts that the increased cardiovascular mortality found in this trial cannot reasonably be attributed to scientific shortcomings in the study.

*Id.* at 28591.[18] A clearer affirmation and reliance on the UGDP study is hard to imagine.

> [Tolbutamide is an oral hypoglycemic drug and a competitor of phenformin.] It did not occur to me to question this state of affairs until 1968 when the first allegation was made that the death rate was higher in the tolbutamide group. At the same meeting another investigator revealed that the biostatistician, Dr. Klimt, was a paid consultant to U.S. Vitamin, the then makers of phenformin. This was at first denied, then acknowledged. A spirited discussion followed during which the potential for abuse under such circumstances was discussed at length. This ended with the demand from the New York delegation that an independent review of the data be undertaken by outside statisticians. Dr. Klimt threatened to resign if this was done. This threat did not meet with universal disapproval, but a compromise was finally reached in which a review would be done but Dr. Klimt would be permitted to choose the reviewers! Drs. Cornfield and Brown were his choices. It is my understanding that they simply reviewed the numbers and methods sent to them by the coordinating center and that raw data were not used even then. This episode caused a rift of major proportions among the investigators.

J.A. at 130–31.

18. The Commissioner of FDA recognized that "[f]rom the time the results of the UGDP study were first reported, the study was subjected to intense criticism by both clinicians and statisti-

Later, in 1977, Secretary Califano of HEW declared phenformin, an oral hypoglycemic drug, an "imminent hazard to public health" under § 505(e) of the Food and Drug Act, 21 U.S.C. § 355(e), and suspended approval of all new drug applications for this drug. The Secretary indicated that he was relying to a considerable extent on the statistical evidence gathered by the UGDP. The order stated that "[t]he FDA, which is experienced in interpreting and analyzing incidence figures for adverse reactions, has examined [the UGDP] statistics and concluded that the incidence figures are scientifically valid." Order of the Secretary Suspending Approval at 11 (July 25, 1977).[19]

Significantly, the proposed labeling change and suspension of phenformin were not undertaken solely on the basis of the published studies of the UGDP. In addition, the Federal Government has twice exercised its right of access to the UGDP raw data to verify the validity of the UGDP findings. When the initial controversy over the UGDP erupted, NIAMDD retained an independent group of biostatisticians, the Biometric Society, to review the UGDP.

The Society was given access to the UGDP raw data for this purpose. After conducting a partial audit, it published a report indicating support for the UGDP findings.[20] Several years later, prior to the suspension of new drug applications for phenformin, the FDA conducted its own audit of the UGDP. Details of this audit are sketchy, but the federal defendants admit that the FDA examined and copied at least a sample of the UGDP data in the course of its examination of the study. Gov.Supp.Mem. of Dec. 5, 1977 at 2.

These Government-sponsored or conducted audits are of considerable importance. By examining the UGDP raw data at first hand, the Government has apparently satisfied itself that the UGDP results are sound. In other words, the Government has relied *directly* on the UGDP raw data in the course of formulating official Government policy. As such, these data are precisely the sort of documents Congress intended to be disclosed under FOIA. *SDC Development Corp. v. Mathews, supra* n. 3, at 1119–20.[21]

cians." 40 Fed.Reg. 28588. He conceded that "a wide-spread belief had developed among many physicians that the UGDP study was somehow flawed in terms of its design and execution, and therefore could not serve as a proper basis for a warning to the medical profession." *Id.*

> The agency therefore decided to postpone implementation of the warning until [review of the UGDP study by a committee of the Biometrics Society] was published. Since the UGDP study was the basis for the proposed warning, the Commissioner believed that this independent review of the statistical validity of the study should be available to all interested persons before taking definitive action. The review by the committee of the Biometrics Society required extensive reanalysis of the data in the UGDP study and was not published until February 10, 1975.

*Id.* at 28589.

The Biometrics Society audit reconfirmed the Commissioner's belief in the need for regulatory action based on the UGDP.

> Although the [UGDP] has shortcomings, which might be expected in any clinical trial of this complexity, the shortcomings do not invalidate the central finding that there appears to be an increased risk of cardiovascular mortality associated with the administration of tolbutamide and of phenformin to

maturity-onset diabetic patients, compared to treatment with diet alone or diet plus insulin. This conclusion has in the past been reached independently by the UGDP investigators, the FDA, and the Biometrics Society committee, and is again affirmed by the Commissioner. Other clinical trials of these oral hypoglycemic drugs are not comparable to the UGDP study and provide insufficient evidence to negate the findings of the UGDP study.

*Id.* at 28591.

**19.** The quoted passage refers to statistics from "all available sources," Order at 11, but it is clear from the context that the UGDP is included. The UGDP is also referred to at pp. 8, 38, 40–41, 46, 63 and 66.

**20.** Committee for the Assessment of Biometric Aspects of Controlled Trials of Hypoglycemic Agents, *Report of the Committee for the Assessment of Hypoglycemic Agents*, 231 JAMA 583 (1975).

**21.** In emphasizing the Government's reliance on the UGDP study and data, I do not imply that the court should give weight to plaintiffs' "need" for the UGDP raw data, or to plaintiffs' position as litigants in the phenformin suspension proceedings. Maj. Op. at ——–—— of

## III.

The majority cryptically asserts that a finding that the UGDP raw data are agency "records" would interfere with the "autonomy" of federal grant recipients. The exact meaning of this is unclear. I do not maintain, nor do plaintiffs argue,[22] that the UGDP is a federal "agency." Consequently, no suggestion has been made that all of the various duties and responsibilities of a federal agency should be imposed on the UGDP. The only question before us is whether the UGDP raw data are agency "records" of HEW. An affirmative answer to this question would require HEW—not the UGDP—to obtain copies of these records in response to plaintiffs' FOIA request. No direct interference with the manner or method in which a grantee conducts its research would result.

Perhaps the majority's reference to "autonomy" means to suggest that scientific activity would be chilled by the knowledge that data produced under a federal grant could, in limited circumstances, become agency "records." This has been advanced elsewhere as a policy reason for not finding the UGDP data to be agency "records."[23] On closer examination, however, I think even this concern carries little force.

The notion that a chilling effect could result from subjecting the records of federal grantees to disclosure could refer to one of three things. First, it could refer to the possibly inhibiting effect of a visit to the laboratory by a federal official executing a FOIA request. As a basis for restricting FOIA, I find this implausible in the extreme. The inconveniences occasioned by an infrequent FOIA request would be no greater than those currently created by conditions attached to the grant, including the possibility of Government inspection.[24] Yet these burdens appear to have had an imperceptible effect on the enthusiasm for federal research grants.

Secondly, the chilling effect notion could refer to the danger that unscrupulous scientists would use FOIA to appropriate valuable research data for their own credit—or profit. This is a legitimate concern, and if all grantee research records were subject to FOIA it could conceivably deter some scientists from seeking federal grants. But the danger of misappropriation is minimal where, as here, the Government has relied on scientific records in the course of its decisionmaking. Government reliance will likely be limited to cases where the results of the study have been previously published or announced. Thus, whatever weight this concern is entitled to in other contexts, it is of little significance where the element of reliance is present.

Finally, federal grant applicants might be inhibited by having methodological or investigatory flaws in their work uncovered through a FOIA request. If *this* is the danger the majority seeks to avoid under the guise of protecting grantee "autonomy," then it is a sad day for both the scientific community and the Freedom of Information Act. The essence of the scientific community, I had thought, is the commitment to the advancement of scientific truth by subjecting findings and conclusions to the "exacting scrutiny of fellow ex-

---

190 U.S.App.D.C., at 1134 of 587 F.2d. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n. 10, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). My point is simply that, because of the Government's reliance, the UGDP data have been absorbed into the federal decision-making process. This factor, together with the factors previously mentioned—federal funding and federal right of access—satisfies me that the UGDP raw data are agency "records." They should therefore be potentially available for disclosure to *all* members of the public.

**22.** Plaintiffs do not challenge the district court's ruling, *see* n. 4 *supra*, that the UGDP is not a federal "agency." Pet. Br. at 28 n. 7.

**23.** *Ciba-Geigy Corp. v. Mathews, supra* n. 3 at 530.

**24.** As noted above, HEW grant regulations already give the Government an unlimited right to inspect grantee records. *See* pp. ——– —— of 190 U.S.App.D.C., pp. 1142–1143 of 587 F.2d, *supra*. This right was in fact exercised in this case when the FDA audited the UGDP data.

perts."[25] Moreover, where scientific data bear the earmarks of agency "records" subject to FOIA, it would be the height of irony to deny disclosure on the ground that it could expose errors or frauds and thereby discourage those who do the work of the Government. FOIA was enacted in part to end the practice of withholding information "only to cover up embarrassing mistakes or irregularities. . . ." S.Rep.No. 813, *supra*, at 3. To restrict the definition of agency "records" to accomplish the same end could only be regarded as a giant leap backwards.

I respectfully dissent.

### On Petition for Rehearing
### ORDER

**PER CURIAM.**

Upon consideration of appellants' petition for rehearing, it is

ORDERED, by the Court, that the aforesaid petition for rehearing is denied.

Circuit Judge BAZELON voted to grant rehearing for the reasons set forth in the attached statement.

*Statement of* BAZELON, *Circuit Judge, as to why he voted for rehearing*:

In their petition for rehearing, the physicians who requested the UGDP data point out the unusual degree of federal involvement in the initiation and conduct of the UGDP study, which, even under the approach taken by the majority, would bring these data within the scope of "agency records." Specifically, plaintiffs suggest that rather than an independently conceived project by scientists who "developed their own methodology," *see* Maj. op. at p. —— of 190 U.S.App.D.C., at p. 1138 of 587 F.2d, the UGDP study was in fact initiated by NIH, which was responsible for developing the research protocol. Petition for Rehearing at 4. Moreover, as a condition of the renewal of the UGDP grant, NIH established a Policy Advisory Board, which, according to plaintiffs, "took initiatives in directing the course of the [UGDP] study," further evidence of government involvement in the on-going UGDP research. *Id.* at 3–4.

The majority opinion notes that "where records are created by a private entity, we believe the applicability of FOIA will turn on whether the government is involved in the core planning or execution of the program." Majority op. at p. —— of 190 U.S.App.D.C., at pp. 1136–1137 of 587 F.2d. Plaintiffs make a strong case that, from the inception of the study, the government involvement in planning and execution has been pervasive.

Thus, in addition to the reasons set forth in my dissenting opinion, plaintiffs' contentions might well furnish an additional basis for finding these data to be "agency records." Plaintiffs, could not previously have known precisely what showing was required under the majority's novel criteria for determining whether the data were agency records.[1] They have now raised a significant factual question which, under the majority's approach, warrants a remand to determine the degree of NIH involvement in the initiation and conduct of the UGDP study, rather than an affirmance of the district court, which had focused exclusively

---

**25.** R. Merton, The Sociology of Science 275 (1973); *see also* B. Barber, Science and the Social Order 89 (1952).

**1.** According to the majority, government involvement in the "core" of a program, see Maj. op. at —— n. 19, —————— of 190 U.S.App. D.C., at 1136 n.19, 1138–1139 of 587 F.2d, is the key to determining whether records created by private individuals or groups are "agency records", which appears to be the first use of that concept in connection with the definition of agency records under FOIA. *Cf. Ciba-Geigy Corp. v. Mathews,* 428 F.Supp. 523 (S.D.N.Y.

1977) where the district court, considering another FOIA request for the UGDP data noted that "[t]here is little official authority to aid the Court in discerning whether documents are agency records." *Id.* at 529. It is noteworthy that the principal authority which "lighted" the majority's path was not even a FOIA case, but an action under the Federal Tort Claims Act. See Maj. op. at p. —— of 190 U.S.App.D.C., at p. 1135 of 587 F.2d, discussing *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).

on the physical possession and ownership of records.[2]

2. Admittedly, the contentions raised in the petition for rehearing are somewhat conclusory. If, however, the plaintiffs lack factual support sufficient to show government involvement in the core of the program, the district court will then be justified in dismissing the suit.

A far less satisfactory course would be to permit plaintiffs to elaborate their contentions on rehearing in this court. Such supplementation would not consist of adducing evidence, but would more closely resemble a proffer, designed to permit us to assess whether a remand in lieu of affirmance would be any more than a formal gesture. I believe that this approach is inferior to directly remanding this case to the district court because the questions involved are largely factual, and to explore them here may work substantial prejudice to both sides by denying them the opportunity to develop the relevant facts through further investigation, discovery and stipulation in the district court. Only with such a record can a court adequately judge the degree of NIH's involvement in the "core" of the UGDP study. However, I do not believe that we should cut off all avenues for the plaintiffs to show the requisite degree of government involvement in initiating and directing the UGDP study, and therefore I voted for rehearing.