668 F.2d 537
 215 U.S.App.D.C. 191
 PUBLIC CITIZEN HEALTH RESEARCH GROUP,
v.
DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, et al.
National Capital Medical Foundation, Inc., Appellant.
PUBLIC CITIZEN HEALTH RESEARCH GROUP
v.
DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, Appellant
National Capital Medical Foundation, Inc., et al.
PUBLIC CITIZEN HEALTH RESEARCH GROUP
v.
DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, et al.
American Association of Professional Standards Review
Organizations,(Intervenor-Deft.), Appellant.
 Nos. 79-2199, 79-2364 and 79-2388.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 13, 1980.
Decided Sept. 30, 1981.
As Amended Sept. 30, 1981.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil Action No. 77-2093).
 Joseph B. Scott, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for federal appellants in No. 79-2364 and cross-appellees in Nos. 79-2199 and 79-2388.
 Lee T. Ellis, Jr., Washington, D. C., with whom John Lewis Smith, III, Douglas K. Spaulding, and Kay M. Small, Washington, D. C., were on the brief, for National Capital Medical Foundation, Inc., appellant in No. 79-2199 and cross-appellee in Nos. 79-2364 and 79-2388.
 Robert D. Reif, Washington, D. C., with whom William G. Kopit, Washington, D. C., was on the brief, for American Association of Professional Standards, appellant in No. 79-2388 and cross-appellee in Nos. 79-2199 and 79-2364.
 David C. Vladeck, Washington, D. C., with whom Alan B. Morrison, Washington, D. C., was on the brief, for Public Citizen Health Research Group, appellee in Nos. 79-2199, 79-2364, and 79-2388.
 William J. Guste, III, New Orleans, La., was on the brief for amicus curiae urging affirmance. Stuart F. Pierson, Washington, D. C., also entered an appearance for amicus curiae.
 Before TAMM, ROBB and MIKVA, Circuit Judges.
 Opinion for the court filed by Circuit Judge ROBB.
 Concurring opinion filed by Circuit Judge TAMM.
 Dissenting opinion filed by Circuit Judge MIKVA.
 ROBB, Circuit Judge:
 
 
 1
 This is an action under the Freedom of Information Act, 5 U.S.C. § 552 (1976) (FOIA) initiated by the plaintiff, Public Citizen Health Research Group (Public Citizen), against the Department of Health, Education and Welfare (HEW or Department)[1] and the National Capital Medical Foundation, Inc. (the Foundation) to compel disclosure of documents. The Foundation has been designated by the Department as the "Professional Standards Review Organization" (PSRO) for Washington, D.C., and it performs its functions under contract with the Department, pursuant to Medicare and Medicaid programs.
 
 
 2
 The Foundation moved to dismiss the action on the ground that it is not an "agency" within the meaning of the Freedom of Information Act, 5 U.S.C. § 552(e) (1976), and that its records therefore are not subject to disclosure under that Act. HEW supported the Foundation on this issue and separately moved for dismissal as to it on the ground that it had neither possession nor control over the documents sought. Holding that the Foundation is an independent agency for purposes of the Freedom of Information Act, the District Court denied the motion to dismiss. However, the court found that the Department had neither possession nor control of the disputed materials. The matter was remanded for administrative processing of the plaintiff's request for disclosure. Public Citizen Health Research Group v. HEW, 449 F.Supp. 937 (D.D.C.1978). Thereafter, the parties having submitted affidavits, the plaintiff moved for summary judgment. The Foundation opposed the motion, contending that the materials sought were exempt from disclosure under Exemptions three, four, five, six and seven of the Freedom of Information Act. In light of this court's decision in Forsham v. Califano, 190 U.S.App.D.C. 231, 587 F.2d 1128 (1978), aff'd, 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980), HEW moved for reconsideration of the court's earlier ruling that the Foundation is an "agency" under FOIA. Alternatively, the Department moved for summary judgment. The intervenor, American Association of Professional Standards Review Organizations, supported the Foundation and the Department. Concluding that none of the FOIA exemptions applied, the court granted the plaintiff's motion for summary judgment and denied the motion for reconsideration. The court granted a stay of thirty days pending appeal and we extended the stay until further order of this court.
 
 
 3
 We reverse because we conclude that the Foundation is not an "agency" for purposes of the Freedom of Information Act, 5 U.S.C. § 552(e) (1976).
 
 
 4
 In 1972 Congress amended the Social Security Act (Act) to establish the PSRO program. Section 249F(b) of P.L. 92-603; 42 U.S.C. § 1320c, et seq. (Supp. III 1979). The legislation was enacted "to promote the effective, efficient, and economical delivery of health care services of proper quality for which payment may be made (in whole or in part) under (the Social Security Act)..." 42 U.S.C. § 1320c. The impetus for adoption of the PSRO system was congressional concern over rapidly rising costs of the Medicare and Medicaid programs[2] and the congressional finding that this increase in costs was caused, in part, by unnecessary use of medical services under these programs. S.Rep.No. 92-1230, 92d Cong., 2d Sess. 254-55 (1972). To assist in stemming this rise in costs, PSROs were established to review the appropriateness, medical necessity, and quality of health care services paid for under the Act, principally Medicare and Medicaid reimbursement. 42 U.S.C. § 1320c et seq.
 
 
 5
 The PSRO program operates through a system of peer review.[3] Under the legislation, the Secretary of HEW is required to enter into an agreement with a "qualified organization", which is designated as the PSRO for a particular locale. 42 U.S.C. § 1320c-1(a) (1976). The Act gives a funding preference to PSROs that are nonprofit, local, physician membership organizations. 42 U.S.C. § 1320c-1(b)(1)(A). Whatever the character of the organization, however, the HEW PSRO designations are reflected in agreements that are for terms of twelve months and are terminable by either the Secretary or the association. 42 U.S.C. § 1320c-1(d) (1976).
 
 
 6
 In general terms, PSROs review health care services, furnished to individuals; collect and analyze patient, practitioner, and provider data; develop local norms of care; conduct various educational activities; and report practitioners and providers who violate certain statutory obligations. 42 U.S.C. §§ 1320c-4, 1320c-6, 1320c-9 (1976). In reviewing health care services rendered by or in institutions for which payment may be made under the Medicare and Medicaid programs, PSROs determine: (1) whether the services are or were medically necessary; (2) whether the quality of services meets professionally recognized standards of health care; and (3) whether the services could have been more appropriately rendered in another less expensive manner. 42 U.S.C. § 1320c-4(a)(1) (1976). The standards governing PSRO review are the professionally developed norms of care, diagnosis or treatment typical of practice in the particular region. 42 U.S.C. § 1320c-5(a) (1976). In order to perform their function, PSROs are given access to patient records (42 U.S.C. § 1320c-4(b)(3)), and are required to maintain "profiles" on physicians and hospitals providing Medicare and Medicaid services. Profiles consist of data about hospital admissions, types of diagnoses, disapproved services, etc. 42 U.S.C. § 1320c-4(a)(4). In addition, in order to perform its quality assurance activities, PSROs have been required by HEW to perform Medical Care Evaluation (MCE) studies. These are in-depth assessments of the quality of the delivery and organization of health care services and are aimed at effecting specific improvements in health care delivery.[4] (J.A. 265)In practice, members of a PSRO such as the Foundation review Medicaid and Medicare patients in hospitals within the PSRO's jurisdiction. The PSROs undertake four steps of review: (1) admission certification; (2) continued stay review; (3) medical care evaluation studies; and (4) profile analyses.
 
 
 7
 Admission certification review concerns the medical necessity of hospital admissions. PSRO members review an admission during the first day of hospital stay to determine whether a patient needs to be hospitalized at all. Based on that review, members predict or "assign" the appropriate length of the patient's stay. 42 U.S.C. § 1320c-4(a)(2).
 
 
 8
 Continued stay reviews are conducted for patients who remain in the hospital beyond the expiration of their predicted stay. These reviews are made to determine whether continued hospitalization is in fact needed. Additional days may be assigned at this time, or, if the PSRO concludes the additional stay is not "medically necessary" the PSRO can disapprove the continued hospitalization. 42 U.S.C. § 1320c-5(d). In that event, once the patient has been notified that the PSRO deems an additional stay to be medically unnecessary, the patient must thereafter either leave the hospital or make private payment.
 
 
 9
 The statute provides that the PSRO determinations with regard to the medical necessity, conformance to provisional standards, and appropriateness of hospitalization "shall constitute the conclusive determination on those issues ... for purposes of payment under this chapter." 42 U.S.C. § 1320c-7(c) (Supp. III 1979). In other words, favorable determinations by a PSRO are binding on HEW and not appealable. Under certain circumstances an adverse decision may be appealed, but in the case before us the District Court found that only about one percent of the decisions made by the Foundation as to medical necessity were adverse.
 
 
 10
 The National Capital Medical Foundation, a PSRO, is a non-profit corporation organized pursuant to the District of Columbia Non-Profit Corporations Act, Title 29 § 1001 of the D.C. Code. The articles of incorporation provide:
 
 
 11
 The Corporation shall have one class of members, namely Participating. Any person holding an unrestricted license to practice medicine and surgery, osteopathy and surgery from, or a license recognized by, the licensing authority in the District of Columbia or in institutions under the jurisdiction of the District of Columbia shall be eligible to apply for a Participating Membership.
 
 
 12
 (J.A. 29) The business, property and affairs of the Foundation are managed by a Board of Trustees consisting of eighteen persons. Fifteen members of the Board are Participating Members of the Foundation, and three members, referred to as "Public Members" are not members of the Foundation. Members of the Board of Trustees are elected by the Participating Members, to serve terms of three years. Any person who has completed two consecutive terms is ineligible to serve on the Board for at least one year after completion of his second term. Candidates for election to the Board are nominated by a nominating committee, or by a statement endorsed by at least ten Participating Members. Voting is by written ballot. (J.A. 34-36) Regular meetings of the Board of Trustees are held in November, and at least quarterly thereafter of each year, and special meetings may also be held. Officers of the Foundation are the President, Vice-President and Secretary-Treasurer. The President and Vice-President, who must be physicians, are elected from the Board of Trustees by the board members. An Executive Director appointed by the Board of Trustees serves as Secretary-Treasurer of the Foundation and of the Board, but without vote. (J.A. 38)
 
 
 13
 The contract between HEW and the Foundation requires the Foundation, referred to as "the contractor", to
 
 
 14
 perform the following activities for all short-stay hospital care for which reimbursement is requested under Titles V, XVIII, and XIX of the Social Security Act. These activities shall be conducted in accordance with the provisions of Title XI, Part B of the Social Security Act, all regulations issued pursuant thereto, and all guidelines and instructions issued by the Department.
 
 
 15
 (J.A. 106)
 
 
 16
 Briefly, the activities to be conducted include: (1) the application to admission review and continued stay review of norms and standards describing the utilization of health services in short-stay hospitals in the contractor's PSRO area; (2) the application of critical screening criteria for acceptable medical care to admission review, continued stay review and, where appropriate, analysis of medical care profiles; (3) responsibility for the performance of admission review and continued stay review of all Titled admissions, using norms, criteria and standards adopted pursuant to (1) and (2) above; (4) provision for the reconsideration of initial admissions, if so required by the patient or provider affected; (5) performance of profile analyses. (J.A. 106)
 
 
 17
 The contract provides that the "contractor will be reimbursed for all costs as described below, incurred directly and specifically in performance of this contract, claimed by the Contractor, and accepted by the Contracting Officer." (J.A. 115) Among the costs described are the salaries of the executive director and medical director of the Foundation, not to exceed $35,000 and $50,000 a year, respectively, and the fees of physician advisers and physician consultants, at specified hourly rates. Also included are rental for office space and the cost of specified items of office furnishings. (J.A. 115, 118, 121, 122) An employee of HEW is designated as the "Project Officer" for the contract, whose responsibility "is to ensure that the Government's technical objectives are met." (J.A. 112) The contract assigns to the "Contracting Officer" responsibility for review and approval of the performance of the contract; but by delegation the Project Officer is given "authority to accept or reject items delivered under the contract following necessary review." (J.A. 112) It is provided that the total cost to the government for performance of the contract "shall not exceed the total Estimated Cost of this contract." (J.A. 114) The total estimated cost is stated in the contract.
 
 
 18
 The District Court held that the Foundation is a government "agency" within the definition of 5 U.S.C. § 551(1). The court focused on the statement in Washington Research Project, Inc. v. HEW, 164 U.S.App.D.C. 169, 179, 504 F.2d 238, 248 (1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), that "(t)he important consideration is whether it (the agency) has any authority in law to make decisions." Applying this test, the District Court found that the Foundation "has such authority and exercises it daily." Public Citizen Health Research Group v. HEW, 449 F.Supp. at 941. This fact, said the court, "alone may be decisive", but there are other "significant factors": the Foundation "is financed by the United States, it is a creature of statute, it performs an executive function, and it operates under direct, pervasive, continuous regulatory control affecting even minutia of the procedures and functions." 449 F.Supp. at 941. Turning to the motion for reconsideration in light of the subsequent decision of this court in Forsham v. Califano, supra, the court found that case distinguishable because the medical centers considered there lacked "independent decisional authority" and were not subject to day-to-day federal control.
 
 
 19
 The PSRO statute established pervasive procedural requirements for virtually every phase of PSRO activities, and organizational requirements governing selection of the PSRO entity and its members. These statutory obligations are supplemented extensively by HEW regulations and by the PSRO Transmittals and Program Manual which are binding on each PSRO.
 
 
 20
 Public Citizen Health Research Group v. HEW, 477 F.Supp. 595, 606 (D.D.C.1979).
 
 
 21
 With specific exceptions not applicable here the Administrative Procedure Act, 5 U.S.C. § 551(1) (1976) defines the term "agency" to mean "each authority of the Government of the United States, whether or not it is within or subject to review by another agency ..." For purposes of the Freedom of Information Act the statute provides that "the term 'agency' as defined in section 551(1) ... includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(e) (1976).
 
 
 22
 This court in the Washington Research Project case, supra, recognized that "recent cases have made it clear that any general definition (of the term agency) can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done.... The unavoidable fact is that each new arrangement must be examined anew and in its own context." 164 U.S.App.D.C. 176-77, 504 F.2d 245-46. We therefore proceed to examine the PSRO arrangement in its own context.
 
 
 23
 We begin with the Report of the Senate Committee on Finance on the Social Security Amendments of 1972, S.Rep.No. 92-1230, 92d Cong., 2d Sess. (1972). It was the 1972 amendments which authorized the establishment of PSROs. Reading the Report, we are struck by the strong and recurrent theme, that the review process must be conducted by practicing physicians, not by the government or government employees. This theme is sounded over and over in the report. Thus:
 
 
 24
 The committee believes that the review process should be based upon the premise that only physicians are, in general, qualified to judge whether services ordered by other physicians are necessary. The committee is aware of increasing instances of criticism directed at the use of insurance company personnel and Government employees in reviewing the medical necessity of services.
 
 
 25
 S.Rep., supra at 256.
 
 
 26
 The committee has therefore included an amendment, as it did in H.R. 17550, which authorizes the establishment of independent professional standards review organizations (PSRO's) by means of which practicing physicians would assume responsibility for reviewing the appropriateness and quality of the services provided under medicare and medicaid.
 
 
 27
 The committee's bill provides specifically for the establishment of independent professional standards review organizations (PSRO's) formed by organizations representing substantial numbers of practicing physicians in local areas to assume responsibility for the review of service (but not payments) provided through the medicare and medicaid programs.
 
 
 28
 Id. at 257.
 
 
 29
 It is preferable and appropriate that organizations of professionals undertake review of members of their profession rather than for Government to assume that role. The inquiry of the committee into medicare and medicaid indicates that Government is ill equipped to assume adequate utilization review. Indeed, in the committee's opinion, Government should not have to review medical determinations unless the medical profession evidences an unwillingness to properly assume the task.
 
 
 30
 Id. at 258.
 
 
 31
 Priority in designation as a PSRO would be given to organizations established at local levels representing substantial numbers of practicing physicians who are willing and believed capable of progressively assuming responsibility for overall continuing review of institutional and outpatient care and services. Local sponsorship and operation should help engender confidence in the familiarity of the review group with norms of medical practice in the area as well as in their knowledge of available health care resources and facilities.
 
 
 32
 Participation in a PSRO would be voluntary and open to every physician in the area.
 
 
 33
 Id. at 259.
 
 
 34
 PSRO physicians engaged in the review of the medical necessity for hospital care and justification of need for continued hospital care must be active hospital staff members. The purpose here is to assure that only doctors knowledgeable in the provision and practice of hospital care will review such care.
 
 
 35
 Id. at 260.
 
 
 36
 It is expected that a PSRO would operate in a manner which conserves and maximizes the productivity of physician review time without unduly imposing on his principal function, the provision of health care services to his own patients.
 
 
 37
 Id. at 264.
 
 
 38
 Employees of the PSRO would be selected by the organization and would not be Government employees.
 
 
 39
 Id. at 266.
 
 
 40
 We think these expressions demonstrate the fixed purpose of Congress that PSROs should be independent medical organizations operated by practicing physicians in the private sector, and not government agencies run by government employees. Government, said the committee, should not undertake to review the appropriateness and quality of medical services. A holding that the Foundation, an organization of private physicians, constitutes a government agency would be inconsistent with the congressional purpose.
 
 
 41
 In reaching the conclusion that the Foundation is a government agency the District Court relied upon two factors: (1) the Foundation has authority to make decisions and (2) the court found that it is subject to day-to-day federal control. We are not persuaded that the court's conclusion is sound, given the context of this case.
 
 
 42
 The court relied heavily on the statement in the Washington Research opinion that the important consideration was whether the agency in that case had any authority in law to make decisions. The district judge thought the authority to make decisions "alone may be decisive" in determining whether an organization is a government agency. We think however that the court's conclusion does not necessarily follow from our decision in the Washington Research case. We held there that because the organization in question had no authority to make decisions it was not a government agency, but the converse of that proposition may not always be true; that an organization makes decisions does not always mean that it is a government agency. As we have said, each arrangement must be examined in its own context.
 
 
 43
 In the context of the Foundation other factors, in addition to congressional intent, negate the conclusion that it is a government agency. The organization and operation of the Foundation carry out the purpose of the statute, that a PSRO shall be an organization independent of the government. The Foundation is a corporation organized under the law of the District of Columbia, and not under federal law. It is controlled by a Board of Trustees all of whom are private individuals. Its physician members are paid for their time on an hourly fee basis. Its employees are not government employees. It carries out its work pursuant to a contract with HEW. It is free to contract, and indeed does contract, to perform various functions for state and city agencies and for insurance companies. Finally, the nature of the decisions which the Foundation makes must be considered.
 
 
 44
 The physicians who are members of the Foundation serve the government in the role of experts. As experts familiar with local conditions and standards they give the government their opinions as to the quality of the medical service being rendered in their localities and the need for those services. By rendering such opinions they do not and should not become part of a government organization, any more than a single physician, consulted on similar questions and submitting a similar expert opinion, would become part of a government organization. True, the statute makes their favorable opinions conclusive; but a moment's reflection will demonstrate that any other arrangement would be impractical: if the Department undertook to review each of the hundreds of thousands of medical opinions submitted the result would be the creation of an unworkable bureaucratic monster.
 
 
 45
 The District Court was impressed by the "pervasive procedural requirements" imposed upon PSROs by the statute and by regulations set out in HEW's "Program Manual." The court found that these directives amounted to "detailed government control" in the planning and implementation of the PSRO program. As explained in the Manual however those controls are only those necessary to assure that the funds given to PSROs are expended properly, that the PSROs comply with the specifications of their contracts and follow uniform procedures. Thus in the preface to the Manual the Department states "(t)he Department of Health, Education, and Welfare recognizes that PSROs operate as independent, private, non-profit corporations." PSRO Program Manual, ch. XXIV, p. 1, June 20, 1978. We think the regulations and statutory provisions do not impose the detailed and day-to-day supervision which would make the PSROs government agencies. Forsham v. Harris, 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980); see United States v. Orleans, 425 U.S. 807, 818, 96 S.Ct. 1971, 1977, 48 L.Ed.2d 390 (1976).
 
 
 46
 The district judge wisely recognized that "the PSRO program will experience a severe setback, if not fatal blow, should PSRO records become generally available through the FOIA." 449 F.Supp. at 941. We agree, but we differ with the court's conclusion that Congress must remedy this situation. In our judgment the statute, as it stands, means that PSROs are not government agencies subject to the FOIA. Accordingly the judgment of the District Court is reversed with directions to dismiss the complaint.
 
 
 47
 So ordered.
 
 TAMM, Circuit Judge, concurring:
 
 48
 I concur in Judge Robb's opinion for the court and write separately only to express my belief that the court's action today does not establish, either explicitly or implicitly, a rigid rule of general applicability for determining whether an entity is an "agency" for FOIA purposes. As the court's opinion stresses, "each new arrangement must be examined anew and in its own context." Majority Opinion at 542, quoting Washington Research Project, Inc. v. HEW, 504 F.2d 238, 246 (D.C.Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). Although the standardless nature of this review imposes an increased burden on future courts which must consider the question, I believe that this burden is an inevitable consequence of a political system in which the means by which the government carries out its functions, and the very boundary between governmental and nongovernmental action, are in a state of perpetual flux.
 
 
 49
 I do not read this opinion to hold, therefore, that the standards set forth in Washington Research Project, supra, and Forsham v. Harris, 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980), are cumulative. That is, I believe that the decision that an entity is an agency for FOIA purposes does not require, in all cases, demonstration of "authority in law to make decisions," 504 F.2d at 248, and "substantial federal supervision of ( ) private activities," 445 U.S. at 180, n.11, 100 S.Ct. at 984. I am not convinced that the combination of these tests will, in all cases, guide the courts to the proper balancing of the values involved in this difficult FOIA issue. Similarly, I think it is clear that the fact that the PSRO function is performed by contract with practicing physicians who are not government employees is not dispositive of the question before us. A galaxy of factors-which may include the nature of the function performed, the authority in law of the entity, the authority in fact of the entity, the nature of the entity, the portion of the entity's business which is done by contract or grant with the government, the congressional intent concerning the status of the entity as evidenced by the legislation approving or authorizing the contract or grant, and the type and degree of control over the entity exercised by the government-must be evaluated and weighed.
 
 
 50
 A court's responsibility when confronted with an issue of this nature, in which Congress has expressed itself only in the vaguest terms, is to successfully navigate a thin line. On one side is arbitrary decisionmaking, which leaves successor courts with no guidance and unbridled discretion. On the other is artificially-standardized decisionmaking, which in an effort to find a principled basis for a decision may create distinctions which have no reference to the values that lie behind the congressional enactment. I believe that the opinion of the court, by offering factors but not dictating standards, successfully travels that thin line.
 
 MIKVA, Circuit Judge, dissenting:
 
 51
 I would affirm the judgment of the district court. The Professional Standards Review Organizations (PSROs) are agencies for the purposes of the Freedom of Information Act (FOIA), and since none of the Act's exemptions applies to the documents sought by the appellant, Public Citizen Health Research Group (Public Citizen), I think Public Citizen is entitled to those documents.
 
 
 52
 The opinion for the court and the concurrence, taken individually and together, are bound to cause confusion in the law of this circuit concerning the application of FOIA to various activities delegated or directed by government. It is difficult to tell whether the opinion of this court is based on a cumulative test, combining the criterion of decision-making authority from Washington Research Project, Inc., 504 F.2d 238 (D.C.Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), with that of close government control from Forsham v. Harris, 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980). My concurring colleague reads the opinion of this court as not employing the cumulative test. If he is correct, then perhaps we should look to the opinion's heavy reliance on the independence of the PSROs from the government to explain the holding that they are not agencies. Yet the concurrence finds it "clear" that the independence of the PSROs is not dispositive.[1]
 
 
 53
 Perhaps the only common ground between the opinion for the court and the concurrence is that there are many relevant factors to consider in each case. What is by no means clear after today is how much weight is to be assigned to the various factors, and whether the presence or absence of any one of them is necessary or sufficient to warrant a finding of agency status. It can be hoped that this state of affairs will be clarified some day.
 
 
 54
 It may well be that this case is too "hard" to expect a proper redaction of these factors and the weights that should be accorded them. Appellees argue, not without reason, that the effectiveness of the reviewing process would be compromised by the exposure of the reviewing doctors' comments and criticisms. Even if the medical privacy of the patients can be safeguarded, as appellants argue, reviewing doctors certainly will be less candid if the records of their review are in the public domain. But that very real concern is addressed to the wisdom of the statute's coverage, not to its wording.
 
 
 55
 The "myriad organizational arrangements for getting the business of government done," Washington Research, 504 F.2d at 246, indeed make it impossible to formulate a simple rule applicable to all cases where agency status is at issue. There are numerous factors, and combinations of factors, that may be relevant in a given context. But this does not mean that we should refuse to employ generalizations that can aid us in deciding most cases that arise.
 
 
 56
 We can derive such a generalization concerning agency status under FOIA. It is apparent from Washington Research and Forsham[2] that two fundamental criteria are involved: independent authority to make decisions, and government control. Regardless of whether other factors are involved, there is good reason to regard each of these criteria as sufficient. Neither criterion is the only sufficient one, nor must both exist together. Bodies with the delegated authority to make significant decisions are agencies in their own right. They act in the place of a preexisting government body in the exercise of a central function. They are subject to FOIA because of the congressional intent to reach entities that "perform governmental functions and control information of interest to the public," H.R.Rep.No. 876, 93d Cong., 2d Sess. 8 (1974) U.S.Code Cong. & Admin.News 1974, pp. 6267, 6274. Bodies that are very closely controlled by the government also are subject to FOIA, but for the opposite reason. They possess too little independent authority to be considered entities separate from the government agency to which they are related. Their records are equivalent to the records of the controlling agency.
 
 
 57
 Rejecting the sufficiency of either of these criteria will work mischievous results. First, requiring courts to strike a new balance of various factors of indeterminate number and significance in every case will lead nowhere. A consistent, predictable body of law on agency status under FOIA will never develop.[3] Second, finding that close governmental control is a necessary condition for agency status would allow for important functions to be farmed out to newly created bodies subject to only minimal supervision, merely in order to avoid the duty to provide information to the citizenry. Currently existing agencies should not be allowed to shirk their responsibilities in this manner, and if Congress desires to apply FOIA less strictly than the terms of the statute require, it can do so in a less roundabout way. Third, holding that decision-making authority is a necessary condition would lead to an obvious perversion of FOIA. Agencies could set up "fronts" to carry out all sorts of functions, while retaining practically total control over their operations-again, merely to circumvent the requirements of FOIA. And finally, to require that both criteria be met in each case may be simply impossible. One cannot demand the simultaneous existence of independence and dependence; the result might well be that no entity would qualify as an agency.
 
 
 58
 As far as this case is concerned, I find it unlikely, after Forsham, that the PSROs are in effect government-controlled corporations. But it is obvious to me that they have significant independent-and, to a considerable extent, unreviewable-decision-making authority. Consequently they meet one of the two criteria that are sufficient to ground agency status for FOIA purposes. The court should have so found, and then it should have proceeded to examine the appellees' contentions with regard to exemptions for the requested documents. Because it instead stopped short with an erroneous determination that the PSROs are not agencies, I respectfully dissent.
 
 
 
 [1]
 HEW has since been renamed the Department of Health and Human Services
 
 
 [2]
 The Health Insurance Program for the Aged and Disabled, popularly known as Medicare, is established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (1976). The Medicaid program ("Grants to States for Medical Assistance Programs") is established under Title XIX of the Act, 42 U.S.C. § 1396 et seq. (1976). Both programs involve reimbursement schemes under which the government reimburses hospitals, physicians or other health care providers for the expenses incurred in furnishing covered services to eligible individuals
 
 
 [3]
 The PSRO program is an outgrowth of a number of private and government programs designed to bring about quality and utilization review of medical services. See S.Rep.No. 92-1230, 92d Cong., 2d Sess. 264 (1972). The Joint Committee on Accreditation of Hospitals (JCAH) requires hospitals to establish quality review mechanisms. JCAH, "Accreditation Manual for Hospitals" (1976), pp. 27-28. As a result, medical audit committees have been formed throughout the country. In addition, under the Medicare and Medicaid programs, each participating hospital and long term care facility is required to have utilization review committees operating until a PSRO assumes responsibility for review. Sections 1861(k) and 1903(i)(4) of the Social Security Act, 42 U.S.C. §§ 1395x(k) and 1396b(i) (1976)
 
 
 [4]
 The legislation also places an obligation upon practitioners and providers of health care services to assure that services provided under Medicare and Medicaid are medically necessary and of professional quality. They are required to support such assurances with such evidence as may reasonably be required by a PSRO. 42 U.S.C. § 1320c-9(a)(1). If their obligations are violated, the doctors or institutions may be "sanctioned" by termination from Medicare and Medicaid program reimbursement or exaction of monetary penalties. 42 U.S.C. § 1320c-9(b). The PSROs are to recommend to the Secretary when sanctions are to be made. 42 U.S.C. § 1320c-6
 The constitutionality of the PSRO provisions has been upheld by the Supreme Court. Association of American Physicians and Surgeons v. Weinberger, 395 F.Supp. 125 (N.D.Ill.1975), aff'd, 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975).
 
 
 [1]
 See Concurring Opinion at 544. I agree. In addition, I am troubled by the inferences that the opinion for the court draws from the legislative history of the Social Security Amendments of 1972. See Majority Opinion (Maj. Op.) at 542-543. The opinion quotes numerous passages referring to the need to set up PSROs consisting of independent practicing physicians rather than federal bureaucrats, and concludes that the organizations therefore were meant to be free from the requirements of FOIA. There is a wide gap in this reasoning. That physicians are best suited to performing the expert functions required of a PSRO, and that they can fulfill their role best without government interference, are two commonsense judgments that simply have nothing to do with FOIA concerns. Freedom from government interference is by no means the same as freedom from accountability to the public under FOIA
 
 
 [2]
 It should be noted that Forsham does not stand for the proposition that close government supervision is required in every instance. The case concerned the University Group Diabetes Program (UGDP), a grantee of the National Institute of Health. It was clear that the UGDP merely generated data for the Food and Drug Administration and HEW to consider; it was never suggested that it possessed any decision-making authority. Thus that criterion was not at issue in the case, and the Court made no reference to it
 
 
 [3]
 One of the dangers presented by such a situation is that a court may be led to adjust the balance of factors according to the perceived desirability of a particular outcome. Indeed, this case may be an illustration. The opinion for the court refers, in its concluding paragraph, to the " 'severe setback, if not fatal blow' " that the PSROs presumably will suffer if they are found to be agencies subject to FOIA. Maj.Op. at 544 (quoting the opinion of the district court, 449 F.Supp. 937, 941 (D.D.C.1978)). The concern is that physicians will view FOIA requests as an unwelcome intrusion upon their privacy and desert the voluntary PSROs en masse. Two responses can be made to such a prediction. First, it is up to Congress to amend the relevant statute if it decides that physicians will not cooperate unless their records are safe from disclosure. And second, the PSRO statute itself provided for the contingency of physician flight. If a group composed of practicing physicians could not be set up in a given area, the Secretary of HEW was empowered to designate other entities-state and local health departments, for example-as the area's PSRO. See 42 U.S.C. § 1320c-1(b)(1)(B), -1(c) (1976 & Supp. III 1979)